ATLANTIC LLOYDS INSURANCE COMPANY of Texas, Centennial Insurance Company, Atlantic Mutual Insurance Company, Barry Brady, and Thomas Gervasio, Appellants,

v.

Sue BUTLER, Sheila Cauley, Brad Godwin, Gayle Godwin, Individually and as Personal Representative of the Estate of Paul Godwin, Deceased, Delores Hardy, Marilyn Savage Martinez, as Personal Representative of the Estate of Helen Janice Savage, Deceased, Thomas J. May, Dean Pickrell, Nicola Pickrell, Individually and as Next Friend of Daniel Pickrell, Isaac Pineda, Alta Self, Individually and as Personal Representative of the Estate of Clifton Self, Deceased, Mary Thomas, Dianne Thompson, Ollie Mae Washington, David Schnake, Melvin Thornton, Willie Stafford, and David Prince, Appellees.

Sue Butler, Sheila Cauley, Brad Godwin, Gayle Godwin, Individually and as Personal Representative of the Estate of Paul Godwin, Deceased, Delores Hardy, Marilyn Savage Martinez, as Personal Representative of

---

the Estate of Helen Janice Savage, Deceased, Thomas J. May, Dean Pickrell, Nicola Pickrell, Individually and as Next Friend of Daniel Pickrell, Isaac Pineda, Alta Self, Individually and as Personal Representative of the Estate of Clifton Self, Deceased, Mary Thomas, Dianne Thompson, Ollie Mae Washington, David Schnake, and Melvin Thornton, Appellants,

v.

Atlantic Lloyds Insurance Company of Texas, Centennial Insurance Company, Atlantic Mutual Insurance Company, Barry Brady, Thomas Gervasio, and H.R. Management Company, Appellees.

H.R. Management Company, Appellant,

v.

Sue Butler, Sheila Cauley, Brad Godwin, Gayle Godwin, Individually and as Personal Representative of the Estate of Paul Godwin, Deceased, Delores Hardy, Marilyn Savage Martinez, as Personal Representative of the Estate of Helen Janice Savage, Deceased, Thomas J. May, Dean Pickrell, Nicola Pickrell, Individually and as Next Friend of Daniel Pickrell, Isaac Pineda, Alta Self, Individually and as Personal Representative of the Estate of Clifton Self, Deceased, Mary Thomas, Dianne Thompson, Ollie Mae Washington, David Schnake, Melvin Thornton, and Zurich Insurance Company, Appellees.

No. 01–01–00608–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 8, 2004.

204

Casey Allen Bell, Daniel O. Goforth, Goforth, Lewis L.L.P., Houston, Willie Stafford, Dickinson, for Appellant.

Nico H. Young, Amy Douthitt Maddux, Baker Botts L.L.P., Lynne Liberato, Haynes & Boone, L.L.P., Richard A. Sheehy, Sheehy, Serpe & Ware, Ronald E. Tigner, Preis, Kraft & Roy, Houston,

Mark A. Ticer, Law Office of Mark A. Ticer, Dallas, for Appellee.

Panel consists of Justices TERRY JENNINGS, ALCALA, and HEDGES.*

## OPINION ON REHEARING

TERRY JENNINGS, Justice.

We deny the parties' motions for rehearing. Tex.R.App. P. 49.3. We withdraw our previous opinion, substitute this opinion in its place, and vacate our previous judgment.

These appeals arise from the trial court's rulings on multiple motions for summary judgment, which disposed of all of the parties' claims, counterclaims, and third-party claims made in connection with a 1993 settlement agreement in a toxic-tort lawsuit.

The plaintiffs below, Sue Butler, Sheila Cauley, Brad Godwin, Gayle Godwin, individually and as personal representative of the estate of Paul Godwin, deceased, Delores Hardy, Marilyn Savage Martinez, as personal representative of the estate of Helen Janice Savage, deceased, Thomas J. May, Dean Pickrell, Nicola Pickrell, individually and as next friend of Daniel Pickrell, Isaac Pineda, Alta Self, individually and as personal representative of the estate of Clifton Self, deceased, Mary Thomas, Dianne Thompson, Ollie Mae Washington, David Schnake, and Melvin Thornton (collectively, the plaintiffs), challenge the trial court's rendition of summary judgment on their claims in favor of the defendants below, Atlantic Lloyds Insurance Company of Texas (Atlantic Lloyds), Centennial Insurance Company (Centennial), Atlantic Mutual Insurance Company (Atlantic Mutual), H.R. Management Company (HRM), Barry Brady, and Thomas Gervasio (collectively, the defendants). The plaintiffs also challenge the trial court's denial of their motion for summary judgment on their claim for breach of the 1993 settlement agreement.

In five issues, the plaintiffs contend that the trial court erred in granting summary judgment for the defendants on the plaintiffs' claims for breach of the 1993 settlement agreement, fraudulent inducement, conspiracy to defraud, negligent misrepresentation, promissory estoppel, quantum meruit, breach of insurance contracts, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code [1]; in granting summary judgment as to motions that had not been properly set or heard; and in ruling that certain documents previously produced in discovery were privileged.[2]

Defendants Atlantic Lloyds and Centennial contend, in two issues, that the trial court erred in granting summary judgment for the plaintiffs on the defendant's counterclaims for fraud, conspiracy to de-

---

* The Hon. Adele Hedges, formerly a Justice of the Court of Appeals, First District of Texas at Houston, became Chief Justice of the Court of Appeals, Fourteenth District of Texas at Houston, on December 8, 2003 and continues to participate by assignment for the rehearing of this case, which was submitted before that date.

1. *See* Tex.Rev.Civ. Stat. Ann. art. 21.21 (Vernon Supp.2004).

2. In their fourth issue, the plaintiffs contend that the trial court erred in reversing an evidentiary ruling made by the appointed trial court master concerning the production and use of certain documents over which the defendants asserted a claim of privilege. This issue affects the evidence available to support the grounds asserted by the plaintiffs in their summary judgment motion on the defendants' counterclaims. Because, as we hold below, the trial court did not err in granting summary judgment in favor of the plaintiffs on the defendants' counterclaims, based on the other evidence in the summary judgment record, we need not address the issue.

fraud, and unjust enrichment brought against the plaintiffs and their former attorney, David Prince.[3]

We affirm.

### Factual and Procedural Background[4]

In 1987, the Texas Department of Agriculture (TDA), pursuant to an investigation, determined that maintenance workers had used chlordane[5] in 1986 and 1987 at the Fondren Green apartment complex in Houston. Westwood Savings and Loan Association (Westwood) owned the complex, and HRM managed the complex until January 1, 1987, when RFG Management (RFG) took over management.

Beginning in 1988, several former residents and employees of the complex filed lawsuits against several defendants, asserting personal injury and related claims based on their exposure to the chemical. These suits were ultimately consolidated in federal district court (the underlying lawsuit).[6] Westwood, HRM and RFG were among the defendants in the underlying lawsuit.

Westwood held an insurance policy from Zurich Insurance Company (Zurich), which provided coverage to any person or organization that managed Westwood's property. In settlement of the claims presented against Westwood and RFG, Zurich tendered the $1 million limits of its policy to the plaintiffs. Zurich then withdrew from defending HRM.

HRM held three insurance policies: (1) a $300,000 primary coverage policy issued by Atlantic Lloyds; (2) a $15 million umbrella policy issued by Centennial, which expired on September 10, 1986; and (3) a $10 million umbrella policy issued by Centennial under which coverage began following the expiration of the $15 million policy. Atlantic Mutual owns Centennial and is its parent company, and it is also the general managing agent for both Centennial and Atlantic Lloyds. Barry Brady was a claims handler for Atlantic Mutual who was assigned to the underlying litigation, and Thomas Gervasio was Brady's supervisor.

In 1993, following lengthy settlement negotiations and two mediations, the plaintiffs, represented at that time by attorneys David Prince and John O'Quinn, settled their claims against HRM in the underlying lawsuit. It is undisputed that insurance coverage was an important issue for the plaintiffs. Atlantic Lloyds and Centennial contended that the $15 million policy did not apply to the plaintiff's claims. Nevertheless, there was no coverage question as to the $300,000 policy and the $10 million policy. As part of the settlement, HRM, through its insurers, initially paid approximately $530,000 to settle the claims of Daniel Pickrell, a minor. After further negotiations with O'Quinn and Prince, HRM paid $9,759,562 to settle the remaining plaintiffs' claims and received releases from all of the plaintiffs.

Also in 1993, and following the settlement of the underlying lawsuit, HRM sued

---

3. Although the defendants state five general issues for our review, they present their arguments in the body of their brief under two main issues, and we address them accordingly.

4. As the record reflects, and as the parties acknowledge, the underlying procedural history of this case is complex. For the sake of clarity, we will address only the parties and claims before us. *See* Tex.R.App. P. 47.1.

5. Chlordane is defined as "a synthetic viscous toxic compound used as an insecticide." The New Oxford American Dictionary 301 (2001).

6. The underlying lawsuit was styled *Melvin J. Thornton, et al. v. Fondren Green Apartments, et al.*, No. 88–04685, in the United States District Court for the Southern District of Texas.

Zurich in federal district court for alleged wrongful settlement practices. HRM asserted that it was an additional insured under the Zurich policy and that Zurich had wrongfully exhausted the limits of the policy without settling any of the claims brought against HRM. The federal district court granted summary judgment in favor of Zurich on HRM's claims, and the court of appeals affirmed the judgment.[7]

The plaintiffs filed the instant suit[8] against the defendants in 1996, asserting that the defendants breached the 1993 settlement agreement and fraudulently induced the plaintiffs into settling their claims by misrepresenting the amount of insurance available for settlement. Specifically, the plaintiffs alleged that the agreement with HRM was reached in accord with the plaintiffs' demand to settle their claims for the full amount of the remaining policy limits of all policies covering HRM for which coverage had not been denied. The plaintiffs alleged that the attorneys for HRM falsely represented to O'Quinn and Prince that only $10.3 million in coverage was available for settlement because coverage under HRM's $15 million policy had been denied. The plaintiffs contended, in part, that coverage under the $15 million policy was not formally denied and that the settlement check delivered to them was drafted against the $15 million policy.[9]

Atlantic Lloyds and Centennial filed counterclaims against the plaintiffs and Prince, asserting that the underlying lawsuit was a fraudulent scheme engineered by Prince and others to defraud HRM and its insurers and that the plaintiffs had exaggerated or falsely represented their injuries and damages. These counterclaims were based, in part, on a 1995 sworn statement given by a former employee of the Fondren Green apartment complex, Willie Stafford, who admitted that he had sprayed chlordane in some of the units at the complex. In his 1995 statement, Stafford testified that he was provided money and cocaine to help recruit additional plaintiffs for the underlying lawsuit and that he was paid by Prince to exaggerate his testimony concerning the number of apartments that he had actually sprayed with chlordane.[10] Atlantic Lloyds and Centennial also produced testimony from other witnesses allegedly corroborating the allegations made by Stafford.

The parties filed multiple summary judgment motions on numerous issues, and, after several oral hearings, the trial court granted summary judgment in favor of the defendants on all of the plaintiffs' claims and summary judgment for the plaintiffs on the counterclaims asserted by Atlantic Lloyds and Centennial. The trial court entered a "global" final judgment on July 11, 2001.

### Standard of Review

■ A party moving for summary judgment has the burden of proving that there

---

7. *H.R. Mgmt. Co. v. Zurich Ins.*, 137 F.3d 1350 (5th Cir.1998) (table).

8. The plaintiffs contend that their lawsuit is based on information obtained as a result of the discovery conducted in HRM's suit against Zurich.

9. Some of the plaintiffs also raised causes of action against Atlantic Lloyds, Centennial, Atlantic Mutual, HRM, Brady, and Gervasio for libel and slander. Zurich was also a plaintiff in the instant suit and brought claims against Atlantic Lloyds, Centennial, Atlantic Mutual, and HRM for breach of contract and tortious interference with contract. The trial court granted summary judgments against the plaintiffs and Zurich on these claims, and no appeal has been taken from these rulings.

10. In subsequent proceedings, Stafford recanted most, if not all, of the substance of this sworn statement.

is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt.*, 690 S.W.2d 546, 548 (Tex.1985); *Farah v. Mafrige & Kormanik*, 927 S.W.2d 663, 670 (Tex.App.-Houston [1st Dist.] 1996, no writ). When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon*, 690 S.W.2d. at 548–49. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *Id.* at 549. When a defendant moves for summary judgment, it must either (1) disprove at least one element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995); *Farah*, 927 S.W.2d at 670.

■ Here, none of the pertinent summary judgment orders specifies the grounds upon which the trial court relied. A non-movant is required to show that each summary judgment ground alleged was insufficient to support summary judgment. *Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex.1995). Accordingly, we will affirm any summary judgment order if any of the grounds presented in the supporting motion is meritorious. *Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex.1995); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989).

■ When, as here, both parties move for summary judgment, the appealing party may challenge the denial of its own motion, as well as the judgment in favor of the prevailing party. *CU Lloyd's v. Feldman*, 977 S.W.2d 568, 569 (Tex.1998). Each party must carry its own burden, however, both as movant and, in response to the other party's motion, as non-movant.

*Id.; James v. Hitchcock Indep. Sch. Dist.*, 742 S.W.2d 701, 703 (Tex.App.-Houston [1st Dist.] 1987, writ denied).

## The Plaintiffs' Appeal

### *Breach of the 1993 Settlement Agreement*

In their first issue, the plaintiffs contend that the trial court erred in granting summary judgment against them, instead of in their favor, on their claim that the defendants breached the 1993 settlement agreement. They argue that the trial court's procedures were "fatally flawed"; that Atlantic Lloyds, Centennial and HRM breached the 1993 settlement agreement as a matter of law; and that, alternatively, the summary judgment evidence established an issue of material fact as to whether the agreement was for "policy limits or a sum certain."

#### *Procedural Issue*

In an initial procedural issue, the plaintiffs argue that, "without notice or hearing," the trial court improperly granted summary judgment for the defendants on the plaintiffs' claim for breach of the 1993 settlement agreement. *See* Tex.R. Civ. P. 166a(c).

In May 1999, the defendants filed a summary judgment motion on the plaintiffs' claim for breach of the agreement, and the plaintiffs filed their response in January 2000. A court master, appointed to rule on pre-trial matters, initially denied the defendants' motion in March 2000. Subsequently, the trial court, at the outset of a hearing that it conducted on August 18, 2000, stated that it had considered the issues presented in the defendant's motion, the plaintiffs' response, and the summary judgment record. The trial court then, on the record, pronounced its ruling that, as a matter of law, the 1993 settlement agreement was for a "sum specific," $9,759,362,

and not for "policy limits." The plaintiffs' counsel then presented argument and authorities to the court in support of their position and in opposition to the defendants' motion. Following its ruling, the trial court asked the parties, "Am I clear on that? Okay. So that's my ruling here this afternoon on that issue." On October 27, 2000, the trial court signed its order granting the defendants' motion and denying the plaintiffs' motion on the plaintiffs' claim for breach of the agreement.

■ The record indicates that, at the hearing, the plaintiffs' counsel made no objection regarding a lack of adequate notice and did not raise such objection at any time thereafter. Accordingly, we hold that any such error was waived. *See* Tex. R.App. P. 33.1; *White v. Wah*, 789 S.W.2d 312, 319 (Tex.App.-Houston [1st Dist.] 1990, no writ).

The plaintiffs also argue that the result of the trial court's July 11, 2001 "global" final judgment was, in effect, to *grant* the plaintiffs' own motion for summary judgment in favor of their claim against the defendants for breach of the terms of the 1993 settlement agreement. We disagree. Such an implied ruling is contrary to the trial court's oral pronouncements from the bench at the August 2000 hearing and to its written October 27, 2000 ruling granting the defendants' motion and denying the plaintiffs' motion. Moreover, in its final judgment, the trial court granted only "all outstanding motions for summary judgment." As a result of the trial court's earlier ruling denying the plaintiffs' motion for summary judgment for breach of the settlement agreement, the plaintiffs' motion was no longer an "outstanding" motion and thus could not have been granted by the trial court's final judgment.

*Terms of the 1993 Settlement Agreement*

One of the grounds asserted in the defendants' summary judgment motion as to the plaintiff's breach-of-contract claim was that, as a matter of law, the terms of the 1993 settlement agreement specified a sum certain, $9,759,362, representing the remaining available limits of the $10 million policy, and that the agreement did not encompass the limits of the $15 million policy.

In contrast, the plaintiffs responded, and contend on appeal, that the summary judgment evidence established, as a matter of law, that they had an oral agreement with the defendants to settle all claims against HRM for all available, unexhausted policy limits or, alternatively, that the summary judgment evidence raised a material fact question on this issue.

■ The law in regard to contract interpretation is clear and well-settled. The interpretation of an unambiguous contract is a question of law, which is reviewed de novo. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex.1999). Whether a contract is ambiguous is also a question of law. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). To determine whether a contract is ambiguous, we look at the agreement as a whole in light of the circumstances present when the parties entered into the contract. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995). We examine and consider the entire writing in an effort to harmonize and to give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* No single provision will control; rather, all provisions must be considered with reference to the whole instrument. *Id.*

■ Our primary concern in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.1994).

If a written contract is worded in such a way that it can be given a definite or certain legal meaning, then the contract is not ambiguous. *CBI Indus.*, 907 S.W.2d at 520. A contract will become ambiguous only if its meaning is uncertain or if it is subject to two or more reasonable interpretations. *Id.* An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Forbau*, 876 S.W.2d at 134.

▇▇▇▇ Moreover, we may not consider extrinsic evidence to contradict or to vary the meaning of unambiguous language in a written contract in order to create an ambiguity. *Sears, Roebuck & Co. v. Commercial Union Ins. Corp.*, 982 S.W.2d 151, 154 (Tex.App.-Houston [1st Dist.] 1998, no pet.). A court may consider the parties' interpretations of the contract through extrinsic or parol evidence *only* after a contract is first determined to be ambiguous. *See Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 283 (Tex. 1996). An "ambiguity must become evident when the contract is read in context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity." *CBI Indus.*, 907 S.W.2d at 521.

In support of their argument, the plaintiffs direct us to deposition and affidavit testimony of O'Quinn and Prince that they reached an oral agreement with HRM's attorneys to settle the plaintiffs' claims for "all available policy limits." The plaintiffs also point to a January 6, 1993 settlement demand letter sent from O'Quinn to Thomas Alleman, an attorney who represented HRM in the underlying lawsuit. O'Quinn's letter read as follows:

> As a result of your conversation with Mr. Prince about settling this case, Mr. Prince and I have met and reached a decision.

> From his conversation with you, Mr. Prince was led to believe that the insurance carrier which had the coverage for your client up to September 10, 1986 in the amount of $15,000,000 has denied coverage. Mr. Prince was further led to believe that, therefore, the only available coverage to pay our clients at this time would be the insurance after September 1986, in the amount of $10,300,000 less the $500,000 paid to Daniel Pickrel [sic], leaving a remaining amount of $9,800,000.

> I believe our clients' claims have value substantially in excess of the $12,000,000 offer we previously made during the mediation process. The punitive damages alone should exceed that figure, and the actual damages themselves exceed that figure. Our clients are facing a lot of extra expense in preparing for the upcoming trial and in presenting their case during the trial. Therefore, we have reluctantly decided to make this one final offer in an effort to settle the case.

> If the insurance carriers you say have the only coverage for these claims will pay the entire amount of their remaining coverage, which we understand to be at least $9.8 million, we will settle all our remaining claims and causes of action against your clients and give a general release, with court costs to be paid by the defendants.

> I want to emphasize we are not making this offer because we think this is sufficient compensation or damages for these claims, but rather, in an effort to avoid the additional expense and then having to fight about the coverage. Therefore, if your insurance carriers or clients wish to accept this offer, they need to do so immediately without delay, because once we spend additional monies preparing this case for trial, our position will probably change. Conse-

quently, we ask for an answer within the next ten (10) days.

On February 9, 1993, in response to an intervening settlement offer, Prince sent a demand letter to Alleman, which read as follows:

This letter will confirm that Mr. O'Quinn and I, on behalf of our twenty-one clients, reject H.R. Management Co.'s settlement offer of Eight Million, Six Hundred Thousand Dollars ($8,600,-000).

Our settlement demand is Nine Million, Eight Hundred Thousand Dollars ($9,800,000.00) as per Mr. O'Quinn's letter of January 6, 1993. This is our final settlement demand and it will not remain open much longer. Once the Response is filed on the Summary Judgment Motion, our settlement demand will be withdrawn and our clients have agreed with Mr. O'Quinn's decision that the case will be tried.

That same day, Alleman sent a letter to O'Quinn and Prince, which read as follows:

This will confirm that *we have agreed to settle all claims and demands by your clients against H.R. Management Company for the sum of Nine Million, Seven Hundred Fifty[-]Nine Thousand, Five Hundred Sixty[-]Two Dollars ($9,759,562.00).* David and I will prepare the appropriate releasing documents using the general format we relied upon in the Daniel Pickrell matter.

I would appreciate it if one of you would sign a copy of this letter and return it to me confirming this agreement at your earliest convenience.

(Emphasis added.) Prince signed this letter on a signature line beneath the word "AGREED" and returned it to Alleman. In March 1993, Prince delivered to Alleman signed and notarized releases from the plaintiffs in exchange for a settlement check totaling $9,759,562.

The plaintiffs argue that the February 9, 1993 letter from Alleman to Prince did not constitute a complete, integrated settlement agreement because it lacked essential terms and, therefore, the parol evidence rule did not apply to bar extrinsic evidence of the parties' intentions and oral representations concerning the terms of the settlement agreement. However, this Court has previously emphasized that:

[O]ne of the exceptions to the general [parol evidence] rule is that if the written instrument itself shows to be either ambiguous or incomplete, parol testimony is admissible to show what the real contract was *to the extent necessary to remove the ambiguity, and to make the contract complete in its terms which show to be incomplete.*

*Warren Bros. Co. v. AAA Pipe Cleaning Co.,* 601 S.W.2d 436, 438 (Tex.Civ.App.-Houston [1st Dist.] 1980, writ ref'd n.r.e.) (quoting *Magnolia Warehouse & Storage Co. v. Davis & Blackwell,* 108 Tex. 422, 195 S.W. 184, 185 (1917)) (emphasis added). In other words, "[w]here a writing is incomplete or ambiguous, parol evidence is admissible to explain the writing or to assist in the ascertainment of the true intentions of the parties *insofar as the parol evidence does not alter or contradict any part of the written memorandum in question.*" *Warren Bros.,* 601 S.W.2d at 438–39 (emphasis added).

Here, the February 9, 1993 letter from Alleman to Prince, subsequently signed and agreed to by Prince, expressly "confirmed" an agreement to settle "all claims and demands by [the plaintiffs] against [HRM] for the sum of [$9,759,-562]." It is true that the letter did not memorialize a time for performance, the specific names of all the settling parties, or the payor of the settlement funds. How-

ever, the fact that such terms were missing from the face of the agreement was not fatal and did not render the agreement ambiguous. Rather, the agreement was merely incomplete, and the trial court could consider parol evidence for the limited purpose of "mak[ing] the contract complete in its terms which show to be incomplete." *See id.* at 438.

When no specific time for performance is stated in a contract, the law will imply a reasonable time. *CherCo Props., Inc. v. Law, Snakard & Gambill, P.C.*, 985 S.W.2d 262, 266 (Tex.App.-Fort Worth 1999, no pet.); *see Moore v. Dilworth*, 142 Tex. 538, 179 S.W.2d 940, 942 (1944). In fact, the parties did, and obviously intended to, fulfill the settlement agreement within a reasonable time after February 9, 1993. In regard to Alleman's proposal, accepted by Prince, to settle "all claims and demands by your clients," there can be no reasonable question that the attorneys for both the plaintiffs and for HRM were aware of the identities of the individual plaintiffs and the nature of their specific claims. In regard to the question of the identity of the payor to fund the settlement, it is evident from the summary judgment record that the parties understood such payors to be either HRM or its "insurance carriers," as referenced by O'Quinn in his January 6, 1993 letter.

The plaintiffs concede in their briefing that, "In the case at bar, all parties agree that there was a contract. The issue here is what are the terms of the contract. . . ." They argue that an oral agreement was reached between their attorneys and the attorneys for the defendants to settle the plaintiffs' claims in the underlying lawsuit for "all available" insurance policy limits covering HRM and that such agreement was incompletely memorialized by the exchange of correspondence culminating in the February 9, 1993 letter.

The plaintiffs also concede that, in settling their claims, they "knew they were not receiving any of the $15 million policy," but they assert that they "mistakenly believed they were receiving all available insurance when they were not."

However, a lack of clarity in the language chosen by the parties does not suffice to render an agreement ambiguous. *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951). Rather, "[o]nly if the intention of the parties *as expressed on the face of the document* is doubtful may the court resort to parol evidence to resolve the doubt." *Massey v. Massey*, 807 S.W.2d 391, 405 (Tex.App.-Houston [1st Dist.] 1991), *writ denied*, 867 S.W.2d 766 (Tex.1993). Again, an ambiguity does not arise simply because the parties advance conflicting interpretations of their agreement. *See Forbau*, 876 S.W.2d at 134.

Here, the February 9, 1993 letter from Alleman, agreed to by Prince, did not in any way memorialize an agreement to settle the plaintiffs' claims for the limits of "all available insurance" policies covering HRM. Rather, we hold that, as a matter of law, the letter was an agreement to settle the plaintiffs' claims for a sum certain, $9,759,562, in exchange for signed releases. The parol evidence on which the plaintiffs rely would have, therefore, materially "alter[ed] or contradict[ed]" the express terms of the 1993 settlement agreement. *See Warren Bros.*, 601 S.W.2d at 438–39.

The plaintiffs also argue that, as an exception to the parol evidence rule, extrinsic evidence may be used to show the existence of a mistake of fact concerning the nature of the 1993 settlement agreement. The parol evidence rule does not apply when it is alleged that, by reason of mutual mistake, "an agreement does not express the real intention of the parties";

in such cases, extrinsic evidence may be admissible to show the real agreement. *Marcuz v. Marcuz*, 857 S.W.2d 623, 627 (Tex.App.-Houston [1st Dist.] 1993, no writ). When mutual mistake is alleged, the party seeking relief must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake. *Id.* Texas courts have held that unilateral mistake by one party, combined with knowledge of that mistake by the other party, is equivalent to mutual mistake. *Davis v. Grammer*, 750 S.W.2d 766, 768 (Tex.1988); *Marcuz*, 857 S.W.2d at 627.

Here, the plaintiffs argue that the summary judgment record "conclusively establishes mutual mistake." However, the record presented does not show that the "real intention" of the 1993 settlement agreement was to settle the plaintiffs' claims for the limits of all applicable policies covering HRM for which coverage had not been formally denied. Rather, the agreement was, as we have held, for a sum certain. Moreover, the summary judgment record does not support the conclusion that the agreement was the result of a unilateral mistake, *e.g.*, a mistake on the part of the plaintiffs as to the terms of the settlement, of which the defendants were aware. The parties dispute the issue of whether counsel for HRM had ever represented to O'Quinn or Prince that coverage under the $15 million policy had been formally "denied" or had simply told O'Quinn and Prince that coverage under this policy was "not available" for purposes of negotiating any final settlement. Prince and O'Quinn had copies of all policies covering HRM and could have made their own assessment of whether coverage under the $15 million

Centennial policy was "available." From the correspondence exchanged by the parties' counsel, it is clear that, in either case, to recover any sum greater than the $10.3 million tendered by the defendants in settlement, the plaintiffs would have first had to take their claims to trial and to obtain an excess verdict. Instead, the plaintiffs, on the advice of Prince and O'Quinn, chose to settle their claims, which O'Quinn acknowledged that they were doing "in an effort to avoid the additional expense [of preparing for and prosecuting their claims at trial] and then having to fight about the coverage."

Thus, we hold that the trial court did not err in determining that the summary judgment record did not establish as a matter of law that the 1993 settlement agreement was the result of a mutual or unilateral mistake. Similarly, we also conclude that the evidence does not raise a fact question as to whether the parties' settlement agreement was the result of a mutual or unilateral mistake.

Because the 1993 settlement agreement was an agreement to settle the plaintiffs' claims for a sum certain, $9,759,562, in exchange for signed releases, we hold that the trial court did not err in determining that the defendants did not breach the terms of the agreement by delivering settlement funds to the plaintiffs in the amount of $9,759,562. Accordingly, we further hold that the trial court did not err in granting summary judgment for the defendants, instead of in favor of the plaintiffs, on the plaintiffs' claim that the defendants breached the 1993 settlement agreement.

We overrule the plaintiffs' first issue.[11]

11. Within this issue, the plaintiffs also argue that the defendants underfunded the 1993 settlement agreement, "confess[ing] to at least $25 million of additional, available coverage because both Centennial's $10 million and $15 million policies were fully available." The plaintiffs base their argument on the fact that, in response to an interrogatory pro-

### Quantum Meruit

In part of their second issue, the plaintiffs contend that the trial court erred in granting summary judgment against them on their claim for quantum meruit because genuine issues of material fact existed as to this claim. Their quantum meruit claim was raised as an alternative ground of recovery to their breach-of-contract claims. As the plaintiffs acknowledge, they could recover in quantum meruit only in the absence of an express contract. *See Murray v. Crest Constr., Inc.*, 900 S.W.2d 342, 345 (Tex.1995). Here, as we have held above, the material terms of the 1993 settlement agreement were expressly set forth in the February 9, 1993 letter from Alleman to Prince. Therefore, we hold that the trial court did not err in granting summary judgment against the plaintiffs on their quantum meruit claim.

We overrule that portion of the plaintiffs' second issue concerning their quantum meruit claim.

### Fraud, Misrepresentation, Estoppel

In their second issue, the plaintiffs also contend that the trial court erred in rendering summary judgment against them on their claims for fraudulent inducement, negligent misrepresentation, and promissory estoppel because genuine issues of material fact existed as to these claims and because the "disclaimer of reliance" provision of the releases signed by the plaintiffs does not preclude these claims.[12]

One of the grounds asserted in the defendants' summary judgment motion as to these claims was that the plaintiffs disclaimed reliance on any allegedly fraudulent representations made by the defendants by signing releases that contained a "disclaimer of reliance" provision.

The plaintiffs' fraudulent-inducement claims are, in essence, based on their contention that they would never have entered into the 1993 settlement agreement had they known that coverage under the $15 million policy had not been formally "denied" and that, to the extent that the defendants represented that coverage under this policy had been "denied," such representations constituted fraud.

Texas law has long imposed a duty not to induce another to enter into a contract through the use of fraudulent mis-

---

pounded in HRM's lawsuit against Zurich, HRM indicated that the 1993 settlement agreement reached with the plaintiffs was funded solely by the $300,000 Atlantic Lloyds policy. HRM's interrogatory answer was later amended.

Nevertheless, the plaintiffs contend that, as a consequence of HRM's original answer to the discovery request, HRM and the other defendants were "judicially estopped" from asserting that the 1993 settlement agreement was funded by either of the two policies issued by Centennial. The plaintiffs conclude that, because the 1993 settlement agreement was an agreement to settle their claims for "all available policy limits," and because HRM initially indicated that no proceeds from the two Centennial policies were used to fund the settlement, the settlement was therefore "underfunded" by $25 million—the sum of the limits of both Centennial policies—in breach of the terms of the parties' settlement agreement.

We disagree. As we have held, the parties reached an agreement to settle the plaintiffs' claims for a sum certain, which was paid. The terms of the parties' settlement agreement did not specify that the settlement be funded under any specific policy or policies. Thus, the trial court did not err in determining that, as a matter of law, the defendants did not "underfund" the parties' 1993 settlement agreement.

**12.** The plaintiffs do not challenge the trial court's rendition of summary judgment on their claims for conspiracy to defraud. Accordingly, we do not consider whether the trial court erred in its judgment denying those claims. *See Garcia v. Nat'l Eligibility Express, Inc.*, 4 S.W.3d 887, 889 (Tex.App.-Houston [1st Dist.] 1999, no pet.).

representations. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 46 (Tex.1998). This legal duty is separate and independent from the duties established by the contract itself; a party is not bound by a contract procured by fraud. *Id.*

A cause of action for fraud requires proof of "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, *which was relied upon,* and which caused injury." *Id.* at 47 (quoting *Sears, Roebuck & Co. v. Meadows,* 877 S.W.2d 281, 282 (Tex.1994)) (emphasis added). Claims for negligent misrepresentation and promissory estoppel also require proof of reliance as an essential element. *Thompson v. Deloitte & Touche, L.L.P.,* 902 S.W.2d 13, 19 (Tex.App.-Houston [1st Dist.] 1995, no writ) ("The elements of negligent misrepresentation include a false representation made for the guidance of others who rely on it and suffer damage."); *Leach v. Conoco, Inc.,* 892 S.W.2d 954, 959 n. 2 (Tex. App.-Houston [1st Dist.] 1995, writ dism'd w.o.j.) ("The elements of promissory estoppel are as follows: (1) a promise; (2) foreseeability of reliance on the promise by the promisor; and (3) substantial detrimental reliance by the promisee.").

To defeat the summary judgment motion on their fraud claims, the plaintiffs had to present evidence sufficient to raise a fact question as to whether the defendants made material misrepresentations with the intent to induce the plaintiffs into settling their claims. Here, the plaintiffs argue that the summary judgment evidence raised a fact question as to whether the defendants materially misrepresented the amount of insurance coverage available to fund any settlement of the plaintiffs' claims. The plaintiffs contend that the defendants' representation that coverage under the $15 million Centennial policy had been denied was known, or should have been known, by the defendants to be false at the time that it was made, was intended to be and was relied upon by the plaintiffs, and caused the plaintiffs to be wrongly induced into settling their claims.

*Effect of the Disclaimer of Reliance*

In support of their argument that the plaintiffs disclaimed reliance on any allegedly fraudulent representations, the defendants rely chiefly on *Schlumberger Technology Corporation v. Swanson,* 959 S.W.2d 171, 179–81 (Tex.1997). The *Schlumberger* court articulated its concern that parties should, under certain circumstances, be able effectively to bring an end to a dispute by executing releases disclaiming reliance as follows:

> Parties should be able to bargain for and execute a release barring all further dispute. This principle necessarily contemplates that parties may disclaim reliance on representations. And such a disclaimer, where the parties' intent is clear and specific, should be effective to negate a fraudulent inducement claim. As an example, a disclaimer of reliance may conclusively negate the element of reliance, which is essential to a fraudulent inducement claim.... The question is under which circumstances such disclaimers are binding.

*Id.* at 179 (citations omitted).

In *Schlumberger,* the parties negotiated a buy-out of the Swansons' interest in a sea-diamond mining project. *Id.* at 174. According to the Swansons, during their negotiations, Schlumberger represented to them that the project was neither technologically feasible nor commercially viable, refused to give them any information or data supporting these representations, and disputed the validity of the Swansons'

rights and interests in the project. *Id.* As part of the negotiated buy-out, the Swansons released Schlumberger from all causes of action, known or unknown, and specifically agreed that they were not relying on any statements or representations of Schlumberger, were relying on their own judgment, and had been represented by counsel, who had explained the entire contents and legal consequences of the release. *Id.* After Schlumberger subsequently sold its interest in the sea-diamond mining project for a profit, the Swansons sued Schlumberger for fraudulently inducing them to sell their interest at an undervalued price. *Id.* A jury found in favor of the Swansons on all issues, but the trial court rendered a judgment notwithstanding the verdict. *Id.* at 174–75. On appeal, the court of appeals reversed and rendered judgment in accordance with the jury's findings.[13]

In reversing the court of appeals and reaching its holding that the language of the release signed by the Swansons precluded all of their claims as a matter of law, the Texas Supreme Court considered it significant that the parties (1) were represented by "highly competent and able legal counsel," (2) negotiated with each other at arm's length, (3) were "knowledgeable and sophisticated business players," (4) disagreed over the value of the mining project, and (5) entered into the release to end their dispute about the value of the project. *Id.* at 180. In characterizing its holding, the court noted as follows:

> In sum, we hold that *a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent*

*inducement.* We emphasize that a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim.

*Id.* at 181 (emphasis added). Therefore, in assessing the effect of the disclaimers at issue in this case, we must analyze not only the language used, but also the particular circumstances under which the disclaimers were executed. *Id.* at 179 ("The contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding.").

██ Here, the individual plaintiffs each signed a release and indemnity agreement releasing HRM and Atlantic Lloyds from all existing and future claims. The releases each contained the following disclaimer:

> I expressly warrant and represent to the parties hereby released and to each of them as a part of the consideration for the payment of the above-mentioned sum of money that before executing this instrument, I have fully informed myself of its terms, contents, conditions, and effect; that in making this settlement I have had the benefit of the advice of doctors and attorneys of my own choosing; and *no promise or representation of any kind has been made to me by the parties hereby released or by anyone acting for them, except as is expressly stated in this instrument. I have relied solely and completely upon my own judgment, and the advice of my counsel in making this settlement;* and I fully understand that this is a full, complete, and final release, and that the sum of money mentioned above is all the money that is to be paid to me by [HRM] as a result of the herein-described accident.

(Emphasis added.) Each release also bore a signature line, signed by Prince, ac-

---

**13.** *Swanson v. Schlumberger Tech. Corp.,* 895 S.W.2d 719, 744 (Tex.App.-Texarkana 1995), *rev'd, Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 175 (Tex.1997).

knowledging that he had "fully and completely" explained the terms of the release to each plaintiff before the release was signed.

The language of the disclaimer signed by the plaintiffs in this case tracks the language of the disclaimer held to be effective by the Supreme Court in *Schlumberger* and similarly expresses the parties' intent unequivocally to disclaim reliance upon representations by the defendants.[14] Additionally, although there is no evidence that the individual plaintiffs were themselves "knowledgeable and sophisticated" concerning the issues raised in the underlying litigation, there is no dispute that the plaintiffs were represented by "highly competent and able legal counsel" who negotiated at arm's length with counsel for HRM.

The plaintiffs argue that the present case is distinguishable from *Schlumberger* because, in that case, the Swansons sued over alleged misrepresentations concerning the value of the mining project, which had been one of the subjects of the parties' dispute and a central reason for the negotiated buy-out. The plaintiffs argue that, in contrast, the defendants' alleged misrepresentations as to the amount of available coverage are not covered by the disclaimer in this case because such misrepresentations were not a subject of the parties' dispute. The plaintiffs assert that "the 'matter in dispute' in the underlying lawsuit concerned chlordane poisoning and damages, not insurance coverage."

We disagree. The record presented here demonstrates that "the specific matters in dispute" in the underlying litigation included the issues of whether HRM's coverage under the $15 million Centennial policy applied to any of the plaintiffs' claims and whether such coverage would form any part of a negotiated settlement of the plaintiffs' claims. The testimony and correspondence contained in the summary judgment record indicate that a sharp disagreement existed between counsel for the plaintiffs and counsel for HRM on these issues. Additionally, O'Quinn testified that, in his opinion, HRM possessed sufficient assets to satisfy a judgment in excess of the limits of its insurance policies. Moreover, as noted above, O'Quinn's January 6, 1993 letter conveyed that the plaintiffs' $9.8 million settlement demand was made in an effort to avoid the expense of a trial and "having to fight about the coverage." Here, as in *Schlumberger*, it is evident that the parties in the underlying litigation entered into a settlement agreement to resolve, in part, their disagreement about the issue of available coverage.

The plaintiffs also argue that the present case is controlled by this Court's opinion in *Decker v. Urrutia*, 965 S.W.2d 26 (Tex.App.-Houston [1st Dist.] 1998), *rev'd*, 992 S.W.2d 440 (Tex.1999). In *Decker*, which involved an automobile accident, this Court reversed a summary judgment granted by the trial court in favor of a driver of a rental truck and the truck rental company. *Id.* at 27. In doing so, we concluded that, because certain insur-

14. The relevant disclaimer language in *Schlumberger* read as follows:

> [E]ach of us ... expressly warrants and represents ... that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and that *none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of*

> *us is relying on his or her own judgment and each has been represented by ... legal counsel in this matter.* The aforesaid legal counsel has read and explained to each of us the entire contents of this Release in Full, as well as the legal consequences of this Release....

> 959 S.W.2d at 180 (emphasis added).

ance provisions contained in the rental agreement were not written on forms prepared by the State Board of Insurance, such provisions were void, were not incorporated into the insurance policy, and did not serve to limit the amount of insurance available to pay the accident victim's claim. *Id.* at 28–29. We held, therefore, that the summary judgment evidence presented was sufficient to raise a fact question regarding the plaintiff's affirmative defense of mutual mistake, and we remanded the case to the trial court. *Id.* at 29.[15]

The plaintiffs rely on our opinion on rehearing in *Decker,* in which we denied the motions for rehearing filed in that case. *Id.* at 30. In our opinion on rehearing, we distinguished *Schlumberger* and noted that a disclaimer signed by the parties in *Decker* did not bar recovery because there was no dispute between the parties as to the amount of available insurance coverage. *Id.* at 30.[16] Because the record here established that one of the matters in dispute between the parties was the availability of coverage under the $15 million Centennial policy, we find *Decker* distinguishable for the same reasons that we find the court's reasoning in *Schlumberger* applicable.

We hold that, based on this record, the disclaimer contained in the releases signed by the plaintiffs conclusively negated the element of reliance on any representations concerning the availability of coverage under HRM's $15 million Centennial policy to

fund a settlement of the underlying litigation.[17] Accordingly, we further hold that the trial court did not err in granting summary judgment for HRM and Atlantic Lloyds on the plaintiffs' claims for fraudulent inducement, negligent misrepresentation, and promissory estoppel.

*Scope of the Disclaimer of Reliance*

 The plaintiffs also contend that, because the releases signed in this case do not specifically mention defendants Atlantic Mutual, Centennial, Brady, or Gervasio, these defendants cannot claim any benefit from the releases' disclaimer of reliance.

 Under Texas law, the mere naming of a "general class of tortfeasors" in a release does not discharge the liability of each member of that class. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 419–20 (Tex.1984). "A tortfeasor can claim the protection of a release only if the release refers to him by name or with such descriptive particularity that his identity or his connection with the tortious event is not in doubt." *Id.* at 420. In *Duncan,* the court held ineffective a release that purported to discharge claims against not only a named airplane owner and its employees, but also against "any other corporations or persons whomsoever responsible therefor, whether named herein or not...." *Id.* at 418.

The plaintiffs argue that the provisions of the release, including the disclaimer of reliance, apply only to those parties partic-

---

**15.** The Texas Supreme Court ultimately reversed our judgment in that case and rendered judgment that the rental agreement was sufficiently incorporated into the insurance policy to satisfy the requirements of the Texas Insurance Code and was not void. *Urrutia v. Decker,* 992 S.W.2d 440, 444 (Tex.1999).

**16.** The Texas Supreme Court did not address this issue in its opinion. *Id.*

**17.** We note that, to the extent that the plaintiffs are also claiming that the defendants fraudulently failed to disclose material facts concerning coverage under the $15 million Centennial policy, such alleged "non-disclosures" are also covered by the disclaimer of reliance. *See Schlumberger,* 959 S.W.2d at 181–82 (holding plaintiffs' alleged non-disclosure allegations were simply converse of alleged affirmative misrepresentations and were covered by disclaimer).

ularly described in the release, namely, "[HRM], all its affiliated companies, parent companies, subsidiaries, officers, agents, and employees, its insurer [Atlantic Lloyds], and all its affiliated companies, officers, agents, and employees."

■ We must presume that parties to a contract intend every contractual provision to have some meaning. *Schlumberger*, 959 S.W.2d at 180; *CBI Indus.*, 907 S.W.2d at 520. Therefore, in determining the proper scope of the disclaimer, we look first to the language of the disclaimer itself, which recites that "no promise or representation of any kind has been made to me by the parties hereby released or *by anyone acting for them.*" (Emphasis added.) Unlike the release held ineffective in *Duncan*, the disclaimer of reliance at issue here did not attempt to include a virtually limitless "general class of potential tortfeasors." 665 S.W.2d at 419. Rather, by its plain language, the disclaimer applies to HRM, Atlantic Lloyds, and those specific parties who had the authority to act on behalf of HRM or Atlantic Lloyds in connection with the underlying lawsuit.

■ Generally, an insurer has a contractual obligation to act on behalf of its insured to retain counsel and to participate in the defense, and possibly settlement, of a lawsuit against its insured if the petition states a claim within the policy coverage. *See Nat'l Union Fire Ins. v. Merchants Fast Motor Lines Inc.*, 939 S.W.2d 139, 141 (Tex.1997). As noted above, it is undisputed that two of HRM's insurance policies were issued by Centennial, which was itself owned by Atlantic Mutual. It is also undisputed that, at all relevant times, Brady and Gervasio were employed by Atlantic Mutual. Brady was a claims handler assigned to the underlying litigation, and Gervasio was Brady's supervisor. Here, the plaintiffs direct us to no evidence in the record that, at any relevant time, Centennial, as HRM's insurer, Atlantic Mutual, as Centennial's parent company, and Brady and Gervasio, as employees of Atlantic Mutual with the actual responsibility of handling the plaintiffs' claims, were not acting on behalf of HRM in conformance with this contractual duty.

Based on the record presented, we hold that, by limiting its application to the specific parties who could and did act on behalf of HRM and Atlantic Lloyds in the underlying lawsuit, the disclaimer of reliance was not so broad as simply to name a "general class of tortfeasors" and described Centennial, Atlantic Mutual, Brady, and Gervasio with sufficient particularity as to include those defendants within the scope of the disclaimer. Accordingly, we further hold that the trial court did not err in granting summary judgment for these defendants on the plaintiffs' claims for fraudulent inducement, negligent misrepresentation, and promissory estoppel.

We overrule the portion of plaintiffs' second issue concerning their claims for fraud, negligent misrepresentation, and promissory estoppel.[18]

---

18. Accordingly, we need not address the plaintiffs' contention that the trial court may have, through its July 11, 2001 global final amended summary judgment, granted the plaintiffs' motion for summary judgment based on judicial estoppel and the "law of the case" doctrine. In their brief, the plaintiffs argue that, should this Court reverse the trial court's judgment and remand the plaintiffs' fraud claims for trial, the defendants would be estopped from arguing that the plaintiffs were required to relitigate the issue of causation on such claims. Additionally, and as acknowledged by HRM in its appellant's brief, we need not address the arguments presented by HRM challenging the trial court's judgment to the extent it may have granted plaintiffs' motion for summary judgment on these issues.

### Insurance Code Claims

 In their third issue, the plaintiffs contend that the trial court erred in granting summary judgment for the defendants on the plaintiffs' claims for breach of insurance contract, breach of the duty of good faith and fair dealing, and violations of article 21.21 of the Texas Insurance Code.[19] The plaintiffs argue that

> [o]nce the insurance companies consented to the settlement, [the plaintiffs] became third-party beneficiaries, and the insurance companies owed a direct contractual duty to deal in good faith with them. Accordingly, by failing to pay all the insurance they had promised to pay, they breached their duty of good faith and fair dealing as well as Article 21.21 of the Texas Insurance Code.

The defendants sought summary judgment on these claims on the grounds that the plaintiffs, as third-party claimants, lacked standing to assert such claims against HRM's insurers.

Insurers are prohibited from engaging in unfair and deceptive acts and practices in the business of insurance, including misrepresenting an insurance policy by

(a) making an untrue statement of material fact;

(b) failing to state a material fact that is necessary to make other statements made not misleading, considering the circumstances under which the statements were made;

(c) making a statement in such manner as to mislead a reasonably prudent person to a false conclusion of a material fact;

(d) making a material misstatement of law; or

(e) failing to disclose any matter required by law to be disclosed, including a failure to make disclosure in accordance with another provision of this code.

TEX.REV.CIV. STAT. ANN. art. 21.21 § 4(11) (Vernon Supp.2004).

Article 21.21 also prohibits an insurer from engaging in "unfair settlement practices" with respect to a claim by "an insured or beneficiary." TEX.REV.CIV. STAT. ANN. art. 21.21, § 4(10)(a) (Vernon Supp. 2004). Such unfair settlement practices include misrepresenting a material fact or policy provision relating to coverage at issue. *Id.* § 4(10)(a)(1). However, article 21.21 expressly provides that claims based on unfair settlement practices are unavailable to third-party claimants such as the plaintiffs. *Id.* § 4(10)(b) (Vernon Supp. 2004) ("[T]his clause does not provide a cause of action to a third party asserting one or more claims against an insured covered under a liability insurance policy."); *see also Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 384 n. 1 (Tex.2000) (noting that "the amended clause did not create a direct cause of action against an insurance carrier by third parties whose claims were based on the liability of the insureds."). As noted by the Texas Supreme Court,

> A third party claimant has no contract with the insurer or the insured, has not paid any premiums, has no legal relationship to the insurer or special relationship of trust with the insurer, and in short, has no basis upon which to expect or demand the benefit of the extra-contractual obligations imposed on insurers under [article] 21.21 with regard to their insureds.

*Allstate Ins. Co. v. Watson*, 876 S.W.2d 145, 149 (Tex.1994).

The plaintiffs emphasize that they brought their article 21.21 cause of action

---

**19.** *See* TEX.REV.CIV. STAT. ANN. art. 21.21 (Vernon Supp.2004).

under section 4(11), not section 4(10)(a), and that standing under "section 4(11), which deals with suits for misrepresenting an insurance policy, is not restricted" to a claim by an insured or a beneficiary. They argue that the Legislature did not intend for "standing to be similarly restricted under both provisions to insureds and third party beneficiaries" and that the purpose of section 4(11) "was to broaden the scope of those who could sue for particular misconduct." The plaintiffs conclude that this logic is "consistent with" the Supreme Court's holding in *Casteel*, "extending standing to a non-insured as a 'person' entitled to sue for misrepresentations." *See Casteel*, 22 S.W.3d at 384.

However, the pertinent holding in *Casteel* was not so broad. The court concluded that "it is consistent with the Legislature's express objective to regulate *all* insurance trade practices to conclude that an insurance agent is a 'person' with standing to sue an insurance company when the agent is damaged by company practices that violate Article 21.21." *Id.* The court emphasized that an opposite construction "would allow an insurer to deceive its agent with impunity, despite knowing that misinformation would eventually reach the public." *Id.*

Although the plaintiffs classify themselves as non-insured "persons" entitled to sue for misrepresentations under section 4(11), they are, in fact, complaining about "unfair settlement practices," which are covered under section 4(10)(a). Here, it is undisputed that the plaintiffs did not purchase an insurance policy from HRM's insurers and that the plaintiffs were third-party claimants who asserted claims against HRM that were covered by its insurance policy.

In *Watson*, the plaintiff was injured in a car accident with Allstate's insured and sued Allstate under article 21.21 for failing to attempt in good faith to effectuate a prompt settlement of her claims, although the insured's liability had been reasonably established. 876 S.W.2d at 146. In *Casteel*, the Supreme Court explained that it had denied standing to the plaintiff in *Watson* "because allowing third-party claimants standing to sue an insurer for unfair claims settlement practices would directly conflict with the well-established duties insurers owe their insureds." *Casteel*, 22 S.W.3d at 384. The court emphasized:

> Among these duties, an insurer must defend its insured *against* the claims asserted by a third party.... But the claimant in *Watson* asked us to extend these same duties to a party *adverse* to the insured.... Allowing third parties a direct cause of action, we determined, would create situations in which an insurer would be exposed to potential liability by these conflicting duties.... No such conflict arises by granting Casteel standing despite his status as Crown's agent. Rather, in this case the duty owed by the insurer to the insured is in harmony with the duty owed to the agent not to misrepresent insurance policy terms. The goal of comprehensively regulating insurance practices is furthered by giving Casteel standing because it strengthens the insurer's incentive to avoid passing misleading information to the public through its agent.... Thus, the rationale behind *Watson* does not apply to Casteel's claims.

*Id.* (citations omitted).

Here, allowing the plaintiffs a direct cause of action against the defendants under section 4(11) would create situations in which an insurer would be exposed to potential liability by conflicting duties. Allowing third-party claimants standing to sue an insurer under section 4(11) would necessarily conflict with the well-estab-

lished duties that insurers owe their insureds. We simply cannot conclude that the Legislature intended this result. Accordingly, we hold that the plaintiffs have no standing to assert claims for breach of an insurance contract, breach of the duty of good faith and fair dealing, or violations of article 21.21 based on any conduct of HRM's insurers prior to the settlement agreement. Thus, we further hold that the trial court did not err in granting summary judgment in favor of the defendants on these claims.

As noted above, the plaintiffs also argue that, after the settlement was reached in the underlying lawsuit, they became third-party beneficiaries of HRM's insurance policies and assumed standing to bring suit for alleged violations of the contractual and extra-contractual obligations owed by HRM's insurers.

The plaintiffs argue that, under this Court's decision in *Hermann Hospital v. National Standard Insurance Company,* they had standing to present claims for breach of the duty of good faith and fair dealing, breach of an insurance contract, and violations of article 21.21. 776 S.W.2d 249, 252 (Tex.App.-Houston [1st Dist.] 1989, writ denied). In contrast to this case, in *Hermann Hospital,* a hospital sued a patient's insurance carrier over representations of coverage allegedly made by the insurer, upon which representations the hospital relied in admitting and treating the patient. *Id.* at 252. However, as this Court noted, that case involved a direct relationship between the parties that is not presented here:

> We find that as a practical matter, *the relationship between insurance companies and providers of health care is a direct one,* with the health care provider acting in reliance on the representations of coverage made by the carriers. Hospitals and other health care providers

must, and do, rely upon the insurance carriers representations of coverage in making their decisions regarding admission of potential patients. If insurance coverage and benefits can be verified, the hospital will usually accept an assignment of benefits to insure it is paid for any services rendered. If insurance coverage and benefits cannot be verified, or if no coverage exists, the medical provider can then make alternative financial arrangements.

*Id.* (emphasis added). We conclude that *Hermann Hospital* is substantively distinguishable.

The plaintiffs also rely on *Getty Oil Company v. Insurance Company of North America,* for the proposition that "claimants become third party beneficiaries of insurance once there is a judgment or settlement approved by the carriers." 845 S.W.2d 794 (Tex.1992). In *Getty,* the court addressed a situation in which a specific insurance policy provision prohibited third-party claims against the insured or the insurer until the insured's liability was determined by a final judgment or agreement. *Id.* at 801. The court noted, "We have held that when such ... policy provisions exist, 'a third party's right of action against the insurer does not arise until he has secured such an agreement or a judgment against the insured.'" *Id.* (quoting *Great Am. Ins. Co. v. Murray,* 437 S.W.2d 264, 265–66 (Tex.1969)). The plaintiffs direct us to no such specific contractual provisions in the present case. Additionally, the third-party claimant in *Getty* asserted contractual rights to be indemnified by the insured and to be named as an additional insured on the applicable policies. The plaintiffs do not assert such contractual rights in this case.

■ The Texas Supreme Court has held that, in the context of a first-party lawsuit by an insured against its insurer

based on an agreed judgment, the insurer's contractual duty of good faith and fair dealing toward its insured does not extend beyond the signing of the agreed judgment. *Mid–Century Ins. Co. of Tex. v. Boyte*, 80 S.W.3d 546, 548–49 (Tex.2002); *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 71 (Tex.1997). Consequently, any claims that the insured may have against the insurer based on the agreed judgment sound in contract, not in tort. *Aiello*, 941 S.W.2d at 71. We find these cases analogous to the situation presented here, in which the plaintiffs argue that they assumed the status of third-party beneficiaries of HRM's insurance policies after the signing of the 1993 settlement agreement. Therefore, assuming that the plaintiffs attained the status of third-party beneficiaries of HRM's insurance policies after the agreement was reached, we hold that HRM's insurers owed the plaintiffs no extra-contractual duty of good faith and fair dealing thereafter; thus, any claims that the plaintiffs have regarding the alleged conduct of HRM's insurers following that settlement sound in contract, not in tort.

We hold that the trial court did not err in granting summary judgment in favor of the defendants on the plaintiffs' claims for breach of an insurance contract, breach of the duty of good faith and fair dealing, and violations of article 21.21 based on the alleged conduct of HRM's insurers subse-

quent to the parties' settlement agreement.

We overrule the plaintiffs' third issue.[20]

*"Abandoned" Motions*

In their fifth issue, the plaintiffs contend that, to the extent that the trial court's July 11, 2001 global, final, amended summary judgment granted any unheard pending motions for summary judgment filed by the defendants, or motions that were denied by the appointed master and not appealed to the trial court, such ruling was in error. Having held that the trial court, based on the grounds asserted in the defendants' motions presented and argued to it, did not err in granting summary judgment on all of the plaintiffs' claims,[21] we need not address the merits of any of the grounds asserted in other, so-called "abandoned" motions.[22]

### The Defendants' Appeal

*Fraud, Conspiracy to Defraud, and Unjust Enrichment*

In their first issue, Atlantic Lloyds and Centennial contend that the trial court erred in granting summary judgment against them on their counterclaims against the plaintiffs and Prince for fraud, conspiracy to defraud, and unjust enrichment. Within these issues, Atlantic Lloyds and Centennial argue that the summary judgment evidence "more than demonstrates a fact issue as to fraudulent misrepresentation" and that the plaintiffs "did

---

**20.** Accordingly, we need not address the additional grounds argued by HRM in its appellee's brief in support of the trial court's summary judgment on the plaintiffs' clams.

**21.** The trial court denied the defendants' summary judgment motion, asserting that plaintiff Marilyn Savage Martinez did not have standing to bring suit on behalf of her deceased mother, Helen Savage. The defendants argue that the trial court erred in denying its motion and that Martinez's lack of standing provided

an alternative basis for summary judgment on her claims. Having held that the trial court did not err in granting summary judgment on all of the plaintiffs' claims, we need not address the merits of this argument.

**22.** The defendants do not assert, in their briefing to this Court, that any of the grounds presented in these abandoned motions supported the trial court's rendition of summary judgment.

not conclusively negate Atlantic Lloyds' and Centennial's reliance on the fraudulent misrepresentations."

*Fraud and Conspiracy to Defraud*

■ The plaintiffs and Prince, in their summary judgment motions on the defendants' counterclaims, argued, in part, that the defendants did not present summary judgment evidence sufficient to raise a fact issue on each element of the defendants' cause of action for fraud. As noted above, to prevail on a cause of action for fraud, a party must offer proof of "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics,* 960 S.W.2d at 47 (quoting *Meadows,* 877 S.W.2d at 282). In their response, the defendants presented voluminous deposition testimony, documents, and expert reports as direct and circumstantial evidence to refute the plaintiff's arguments and to raise a material fact question.

In order to demonstrate the falsity of the plaintiffs' allegations of wide-spread spraying of chlordane at the apartment complex, the defendants produced the following: (1) the deposition testimony of Annette Lorback, a resident of the apartment complex, who never saw any of the plaintiffs, her friends, or members of her own family who lived at the complex exhibit any signs of illness; (2) the deposition testimony of Toni Armeli, a former manager of the apartment complex, that none of the residents complained of sickness to her; (3) the deposition testimony of Lonnie Jackson, a handyman who assisted Stafford, that only two vacant apartments and three or four other apartments were sprayed with chlordane and were then cleaned; (4) an analysis of the original deposition testimony given by Stafford and Isaac Pineda, another handyman at the complex, that indicated that the apartments of 14 of the 22 plaintiffs were probably not sprayed; (5) the deposition testimony of many of the plaintiffs, who did not know whether their apartments had been sprayed with chlordane; (6) the results of testing at the apartment complex, conducted by the City of Houston, that measured the highest level of airborne chlordane, which was approximately 1/16th of the permitted OSHA exposure level, in a vacant apartment; (7) the testimony of (a) TDA investigator Eujean Hinze that the levels of chlordane measured at the apartments were below the approved levels of exposure and (b) Stafford, who, when questioned in connection with the investigation of the spraying, could not verify which apartments were sprayed with chlordane and did not remember whether he used chlordane or another pesticide; and (8) the conclusions and opinions of John Yocum, a professional engineer and environmental consultant retained as an expert witness by the defendants, that concentrations of chlordane were higher in unoccupied apartments than in occupied ones.

With regard to the plaintiffs' allegations of medical injuries and damages resulting from chlordane exposure, the defendants asserted that such evidence was misleading, incomplete, or manufactured. The defendants argued that the summary judgment evidence demonstrated that (1) none of the plaintiffs' treating or examining physicians performed a differential diagnosis on any of the plaintiffs to rule out other potential causes of their alleged conditions and symptoms; (2) the plaintiffs' treating physicians took inadequate medical histories and failed to note or to take into consideration the fact that several of the plaintiffs had significant, documented, preexisting health factors, including alcoholism, anxiety disorders, cancers, diabetes,

drug abuse, exposure to other pesticides, heart attacks, hypertension, obesity, psychiatric problems, physical or mental abuse, sexually transmitted diseases, sleep disorders, long-term smoking, and surgeries; (3) the plaintiffs' physicians relied only on literature provided to them by Prince in forming their conclusions that the plaintiffs' conditions and symptoms were caused by exposure to chlordane; (4) many of the plaintiffs did not undergo toxicological testing, such as a fat biopsy, to detect the levels of their alleged chlordane exposure; (5) those plaintiffs who were tested did not show the presence of unsafe levels of chlordane and showed exposure to other chemicals; and (6) an alleged "close personal relationship" existed between Dr. Howard Siegler, one of the plaintiffs' treating physicians, and O'Quinn.

The defendants also presented the opinions of their own medical experts. Dr. John Meyer, a board-certified neurologist, testified that he reviewed the plaintiffs' medical records and the relevant medical articles and literature and formed the opinion that none of the plaintiffs had objective neurological or psychiatric signs attributable to chlordane exposure. Dr. Wayne Snodgrass, a board-certified toxicologist and pharmacologist, testified that the levels of chemicals detected in the blood and fat tissue samples taken from Stafford and Melvin Thornton, another plaintiff, were more consistent with acute, recent chlordane exposure (*e.g.*, within a few hours before the blood test) than with high levels of exposure over a long term.

Additionally, the defendants presented the opinions and report prepared by Barry Zalma, a certified fraud examiner retained as an expert witness by the defendants. In his report, Zalma concluded that, in his opinion, there were more than 50 separate indicators that the plaintiffs' underlying claims were fraudulent, including: (1) the plaintiffs' injury claims were subjective and persisted contrary to medical studies; (2) the plaintiffs gave false or incomplete medical histories to their doctors; (3) the plaintiffs' treating physicians prepared and submitted identical medical reports for each plaintiff, despite differences in exposure, symptoms, medical history, and physical condition among the plaintiffs; (4) the plaintiffs failed to mention their alleged chlordane exposure to any doctor other than one hired by their attorneys; (5) the plaintiffs did not seek any medical attention until after they had signed a power of attorney; (6) after the 1993 settlement, the plaintiffs did not use the settlement proceeds for medical monitoring; (7) reports existed from non-treating doctors who could find no link between the alleged exposure and the plaintiffs' alleged conditions and symptoms; (8) the plaintiffs' claim of widespread spraying was physically impossible, based on the fact that a single, half-gallon bottle of chlordane was purchased and could not have been sufficient to spray 20 or more apartments, as alleged; (9) when the bottle was seized by the TDA in its investigation, eight ounces of chlordane remained unused; and (10) indoor spraying of other pesticides at the apartment complex, as shown on work orders from an exterminating company, had occurred.

The plaintiffs and Prince argue that the defendants failed to put forth any evidence in response to the plaintiffs' summary judgment motions that the defendants acted in reliance upon the alleged misrepresentations. It is well-settled that a party asserting a cause of action for fraud must prove that it "actually and *justifiably* relied" on the alleged misrepresentation and thereby suffered injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex.2001) (emphasis added); *see Am. Tobacco Co.*,

*Inc. v. Grinnell,* 951 S.W.2d 420, 436 (Tex. 1997) (noting that allegedly defrauded party must show that it "reasonably" relied on misrepresentations). As the Restatement (Second) of Torts sets forth:

> One who makes a fraudulent misrepresentation is subject to liability to the persons ... whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their *justifiable* reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

RESTATEMENT (SECOND) OF TORTS § 531 (1977) (emphasis added); *see Tex. Capital Sec., Inc. v. Sandefer,* 58 S.W.3d 760, 772–73 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). In other words, in the context of two opposing parties engaged in litigation and negotiating at arm's length and from equal bargaining positions, one party cannot prevail in a subsequent action for fraud based on its "reliance" on its opponent's obvious lie or on a misrepresentation that, with reasonable diligence, could easily have been refuted. Such reliance is not justifiable or reasonable.

As evidence of their reliance on the truth of the claims raised by the plaintiffs in the underlying lawsuit, the defendants pointed to the fact that they ultimately agreed to settle the plaintiffs' claims for $10.3 million. However, the summary judgment evidence does not support the defendants' assertion that their reliance on the plaintiffs' claims in the underlying suit was justifiable or reasonable. Much of the summary judgment evidence on which the defendants relied as indicative of fraud had already been obtained through discovery in the underlying lawsuit. In his report summarizing his analysis of the underlying litigation, Zalma, the defendants' retained fraud examiner, concluded as follows:

Shortly before the settlement the Defendants' case was improving. [Additional doctors'] reports were in, Plaintiffs' [sic] could not produce objective evidence of injury and were concerned that taken individually the damages awarded would be small. Prince brought in O'Quinn to trade on his fame and skill. O'Quinn did nothing but lend his name and negotiating skill to the suit. That fame caused [HRM] to raise its offers more than twofold. *Fraud indicators that should have been obvious to the defense team were clouded by the desire to resolve the case before O'Quinn's reputation caused more damage to the defendants than could be reasonably anticipated.*

(Emphasis added.)

The defendants also argued that, because of Stafford's and Prince's deception, they could not have uncovered the allegedly fraudulent nature of the plaintiffs' underlying claims until several years after the 1993 settlement agreement. However, this argument is refuted by much of the defendants' own summary judgment evidence, including critical analyses of the plaintiffs' medical records, their treating physicians' reports, their depositions, and the testing conducted at the apartment complex. Thus, at the time that HRM decided to settle the plaintiffs' claims, substantial information supporting the material allegations contained in Stafford's 1995 sworn statement—that spraying was limited and not widespread and that plaintiffs with little or no exposure to chlordane and few or no injuries had asserted claims in the underlying lawsuit—had been obtained by and was already in the possession of HRM as a result of its discovery in the underlying lawsuit, as shown by the defendants' own summary judgment evidence. The defendants have not shown how they were prevented from uncovering the true nature of these allegations contained in the

materials produced in discovery in the underlying suit.

Additionally, several factors other than reliance on the truth of an opponent's allegations may influence a party's ultimate decision to settle disputed claims in a lawsuit, including the nature of the liability facts, the nature of the damages alleged, the number of parties involved, the perceived propensity of a jury in the forum to return a significant damage award, the level of skill of opposing counsel, the quality of the appearance of the fact witnesses and parties, and the costs associated with continued discovery, trial preparation, and trial itself. Furthermore, settlement agreements typically do not admit wrongdoing on the part of the alleged tortfeasor.

Based on the record presented, we hold that the summary judgment evidence did not raise a material fact question as to whether the defendants justifiably or reasonably relied upon any alleged misrepresentation made by the plaintiffs in the underlying lawsuit. Accordingly, we hold that the trial court did not err in granting summary judgment in favor of the plaintiffs and Prince on the defendants' counterclaims for fraud and conspiracy to commit fraud.[23]

*Unjust Enrichment*

The defendants further contend that the trial court erred in granting summary judgment on their equitable counterclaim of unjust enrichment against the plaintiffs and Prince because the evidence indicated that the proceeds of the 1993 settlement agreement were obtained "as a result of their scheme to commit insurance fraud." The defendants note that "[a]n action for unjust enrichment is based upon the equitable principle that a person receiving benefits which were unjust for him to retain ought to make restitution." *Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 927 (Tex.App.-Fort Worth 1994, writ denied).

However, "[g]enerally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). "When a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement." *Id.* This Court has also previously held that "unjust enrichment claims are predicated on the absence of an express contract controlling the circumstances." *Inglish v. Prudential Ins. Co.*, 928 S.W.2d 702, 706 (Tex.App.-Houston [1st Dist.] 1996, writ denied).

Here, we have held that the defendants did not present sufficient summary judgment evidence to raise a material fact question concerning whether they were fraudulently induced into the 1993 settlement agreement. Therefore, a "valid, express contract" (the 1993 settlement agreement) existed "which cover[ed] the subject matter of the parties' dispute" (the value of the plaintiffs' claims), and the defendants' claim for unjust enrichment is precluded. Accordingly, based on the record presented, we hold that the trial court did not err in granting summary judgment in favor of the plaintiffs and Prince on the defendants' counterclaims for unjust enrichment.

---

23. Accordingly, we need not address the merits of the plaintiffs' objections to the defendants' summary judgment evidence, or the plaintiffs' remaining arguments raised as affirmative defenses to the defendants' fraud counterclaims, that any allegedly fraudulent conduct by the plaintiffs or Prince was protected by a "litigation privilege" or was "ratified" by the defendants and that the defendants' counterclaims were an impermissible "collateral attack" on the judgment of the underlying lawsuit.

We overrule Atlantic Lloyds's and Centennial's first issue.

### *"Judicial Estoppel" and "The Law of the Case"*

In their second issue, the defendants argue that the trial court erred in granting summary judgment for the plaintiffs on the grounds that the defendants' counterclaims were barred under the theories of "judicial estoppel" and "law of the case." Specifically, the defendants challenge the plaintiffs' assertions, made in the plaintiffs' summary judgment motions, that (1) the defendants were estopped by a previous interrogatory answer from arguing that any proceeds from a Centennial insurance policy were used to fund the 1993 settlement agreement and (2) in the event that this lawsuit might be remanded to the trial court, the defendants could not re-litigate the issue of causation. However, because our holdings on the other issues raised in this case dispose of the defendants' appeal, we need not address this issue.

### Conclusion

We affirm the judgment of the trial court.