Opinion Issued October 6, 2005





 













In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-03-00924-CV
____________
 
MARY WILLIAMS, D.D.S. and RUSSELL WILLIAMS, D.D.S., Appellants

V.

L.M.S.C., INC., D/B/A THE DENTAL SOLUTION, Appellee




On Appeal from the County Civil Court at Law No. 2
Harris County, Texas
Trial Court Cause No. 750,537
 

 
 
MEMORANDUM OPINION ON REHEARING
          We deny the parties’ motion for rehearing. Tex. R. App. P. 49.3. We withdraw
our June 2, 2005 opinion, substitute this opinion in its place, and vacate our June 2,
2005 judgment.
          Appellee, L.M.S.C., Inc., d/b/a The Dental Solution (TDS), sued appellants,
Mary Williams, D.D.S. (Mary) and Russell Williams, D.D.S. (Russell), for breach of
contract and, alternatively, in quantum meruit, to recover an unpaid placement fee. 
A jury found that Mary and Russell had breached the contract and were also liable in 
quantum meruit and, therefore, awarded TDS $6,269.82 in actual damages, $3,212.55
in prejudgment interest, and $14,652.50 in attorney’s fees. The trial court rendered
judgment on the verdict. In six issues, Mary and Russell challenge the legal
sufficiency of the evidence supporting the verdict.



          We affirm.
Factual and Procedural Background
          TDS, a business owned by Lisa Carter, is a placement service that places dental
personnel with dentists. Mary and Russell, who are related by marriage, practiced
dentistry together at 1003 Wirt Road, Houston, Texas, under an “office-sharing
arrangement” during the time periods pertinent to this case. On December 4, 1997,
Mary signed a “Placement Agreement” (the “Agreement) with TDS. The first
paragraph of the Agreement, provided, in part:
This agreement is made as of the date indicated below by and between
THE DENTAL SOLUTION (hereinafter referred to as “TDS”) . . . and
the undersigned Dentist(s), Partnership of Dentists, Professional
Corporation, or owners of a Dental Office (hereinafter referred to as
“CLIENT”). . . . TDS is in the business for referring for temporary and
permanent employment–DENTAL HYGIENISTS, DENTAL
ASSISTANTS or FRONT DESKS (DENTAL ASSISTANTS and
FRONT DESKS hereinafter referred to as “DENTAL ASSISTANTS”)
. . . . DENTAL HYGIENISTS AND DENTAL ASSISTANTS referred
to CLIENT by TDS shall sometimes be collectively referred to as
“SERVICE PROVIDERS.” 
 
          The Agreement also provided for (1) the amount of the daily compensation that
a TDS client must pay to the dental hygienists, assistants, and administrative
employees who are placed by TDS with the client, and (2) the amount of the
placement fee owed to TDS for the temporary placement of dental hygienists, dental
assistants, and administrative workers for an eight-hour day and for a four-hour day. 
Furthermore, Paragraph 9 provided for the amount of the placement fee owed to TDS
for the permanent placement of TDS employees and stated, in part: 
In the event CLIENT employs, joint ventures with, associates with or in
any manner affiliates with a SERVICE PROVIDER or enters into any
contractual relationship with a SERVICE PROVIDER referred to the
CLIENT by TDS directly or indirectly through any TDS placement, on
a full time basis during the term of this Agreement and for a period of
one (1) year after the date of termination of this Agreement, CLIENT
agrees to pay TDS a placement fee equal to twelve (12%) of the yearly
gross compensation to be paid to the SERVICE PROVIDER. For
purposes of this Agreement, “Gross Compensation” shall include all of
the following paid to DENTAL HYGIENIST or DENTAL
ASSISTANT: (1) all salary, (2) bonuses, and (3) the value of all benefits
taken in lieu of salary. There will be a guaranteed ninety (90) day pro-rated return of the PLACEMENT FEE if the permanent employment of
DENTAL HYGIENIST or DENTAL ASSISTANT is terminated prior
to ninety (90) days after permanent employment is commenced. The
permanent PLACEMENT FEE will be due in full prior to the
commencement of permanent employment. In the event a placement fee
is earned by TDS for a permanent placement, CLIENT is not entitled to
any credit for placement fees previously paid to TDS for temporary
placements of the SERVICE PROVIDER in question.
 
          Moreover, Paragraph 16 provided:
The Compensation Rates and Placement Fees are subject to change. 
TDS will provide CLIENT with thirty (30) days written notice of a
change in Compensation Rates or Placement Fees. In the event CLIENT
does not terminate this Agreement within thirty (30) days of TDS
sending such notice to CLIENT, this Agreement will automatically be
deemed to be amended to include the new Compensation Rate or
Placement Fees.
 
Lisa Carter, the owner of TDS, testified that, following the procedure set forth in
Paragraph 16, TDS and Mary and Russell amended the Agreement when TDS sent
two revised fee schedules to Mary and Russell, which were effective May 1, 1998,
and June 1, 1999, respectively. 
          The two fee schedules stated that they “serve[] as an addendum to any existing
contract” and provided for the fees due to TDS for the placement of “DENTIST[S],”
as well as for the fees owed for the placement of dental hygienist and assistants. 
Additionally, the May 1, 1998 fee schedule stated that the “PERMANENT
PLACEMENT FEE” was “12% yearly gross,” and the June 1, 1999 fee schedule
stated that the “PERMANENT PLACEMENT FEE” fee was “13% yearly gross.” 
Neither Russell nor Mary terminated the Agreement within 30 days after receiving
the schedules. 
          After the Agreement was signed, beginning in December 1997, TDS began to
place dental workers at the Wirt dental office, for which Russell testified that he held
the lease in only his name from 1985 to 2001.


 TDS first placed Diana Flanagan at
the Wirt dental office on a temporary basis as a dental hygienist beginning in June
1998. Thereafter, TDS placed Flanagan at the Wirt dental office eight more times as
a dental hygienist on a temporary basis. It is undisputed that, from June 1998 to
August 1999, Russell paid all the placement fees due to TDS for the temporary
placement of Flanagan as a dental hygienist. It is also undisputed that, after TDS sent
the two revised fee schedules to the Wirt office, Russell paid the increased placement
fees to TDS for the placement of temporary dental workers. Russell testified that
Mary received both revised fee schedules, that he was aware of the fee schedules, and
that he paid under the new terms of the fee schedules. 
          Carter testified that, around August 31, 1999, Flanagan called her to explain
that Flanagan would no longer be available to be placed by TDS because she was
going to work permanently for Russell and Mary beginning August 31, 1999. Russell
testified that Flanagan’s last day working as a dental hygienist at the Wirt office was
August 19, 1999, because she had become licensed to practice as a dentist on or about
September 1, 1999. Thereafter, Flanagan practiced at the Wirt office as a dentist, not
as a dental hygienist. Russell testified that, after August 1999, he had a contract with
Flanagan for her to practice at the office as a dentist, that Flanagan had the same type
of expense-sharing agreement he had with his other dentists practicing in his office,
and that, from August 31, 1999, to August 31, 2000, he paid Flanagan about
$48,383.28 for the work that she performed as a dentist. 
           Carter testified that, during a phone conversation that occurred some time in
August 1999, Russell told her that Mary had a contract with TDS, but that he did not,
and that, therefore, he was not obligated to pay any permanent placement fee. 
Furthermore, Carter explained that Russell told her that, after Flanagan had told him
that a permanent placement fee would be involved in hiring Flanagan as a permanent
candidate because TDS had originally sent her to the office, Russell requested copies
of the Agreement so that his attorney, who was also his brother-in-law, could “review
them, to see if there is a loophole to avoid the fee.” Carter further explained that,
because Flanagan had gone to work at Russell’s and Mary’s office on a permanent,
full-time basis, TDS was no longer able to place Flanagan for her services.
          Regarding the Agreement and the two fee schedules, Carter testified that the
Agreement and the revised fee schedules had always applied to the placement of
dentists. On cross-examination, Carter agreed that, although the Agreement
mentioned the word “dental hygienist” 40 times and the word “dental assistant” 37
times, the Agreement did not “contemplate or mention the word placement of a
dentist.” 
          Russell testified that he had first seen the Agreement some time after August
1999, that he had not understood that the two fee schedules were a part of the
original contract, and that he had thought the daily placement fees for temporary
placements were paid pursuant to an oral agreement between TDS and Mary. 
However, Russell also testified that, to pay TDS its fees, he used invoices sent by
TDS, the two revised fee schedules, and Mary’s explanation of the fees. However,
Russell later testified that he only learned of the “addenda” through discovery, and
that, before Flanagan became licensed to practice as a dentist, he paid the daily
placement fees to TDS and Flanagan’s wages based on what he had learned from
Mary and from invoices that he had received from TDS. 
          Regarding Russell’s and Mary’s relationship, Carter testified that she had 
understood the contract to be between TDS and the “association of Dr. Russell and
Mary Williams.” Regarding his professional relationship with the other dentists
practicing in his dental office, including Mary and Flanagan, Russell testified that he
had “some type of contract with everyone,” that all the services performed from the
office were billed in his name, and that it was his practice to retain 60 percent of
revenues from services performed to pay expenses for the office and to disburse 40
percent of revenues back to the dentists practicing in his office. However, regarding
his professional relationship with Mary, Russell testified that he became “affiliated”
with Mary after she graduated from dental school around 1996 or 1997 when Mary
began her dental practice in his dental office. Russell further testified that he had
never had a partnership agreement with Mary, that he did not form a professional
corporation with her, that Mary had no ownership interest in his dental office or
practice, that Mary had maintained her own malpractice insurance, and that Mary
never had authority to sign checks for his office. However, he also explained that he
and Mary had an expense-sharing agreement and that he had the same type of
agreement with all his associates. 
           Mary testified that, although she signed the Agreement, she did not sign it on
Russell’s behalf and that she and Russell had not formed a partnership. However,
during cross-examination, Mary indicated that, before she left the office in 2001, she
and Russell had had an agreement “to share income and expenses,” but she explained
that she was “just an associate” and not a partner. Furthermore, Mary testified that,
when she called TDS for temporary placements, she was calling “on behalf of the
office.” 
           The case was submitted to the jury in broad form questions. Question Number
One asked the jury, “Did any of the following fail to comply with the terms of the
agreement with The Dental Solution?,” to which the jury answered, “Yes,” for both
Mary and Russell. Question Number Three asked the jury, “Did The Dental Solution
provide compensable work for Russell Williams?,” to which the jury answered,
“Yes.” The trial court rendered judgment on the verdict. Mary and Russell filed
motions to disregard the jury’s findings, for judgment notwithstanding the verdict,
and for a new trial. The trial court overruled the motions.
Waiver
          We note that, initially, TDS argues that Russell and Mary waived their
complaints as to all the findings against them by failing to object to the submission
of those issues. However, “[a] claim that the evidence was legally or factually
insufficient to warrant the submission of any question may be made for the first time
after verdict . . . .” Tex. R. Civ. P. 279. It is well settled that an attack based on legal
sufficiency of evidence to support a jury finding may be preserved for appeal in any
of five ways: (1) objection to the charge; (2) motion for directed verdict; (3) motion
to disregard the finding; (4) motion for judgment notwithstanding the verdict; or
(5) motion for new trial. Cecil v. Smith, 804 S.W.2d 509, 510-11 (Tex. 1991). Here,
Russell and Mary challenged the legal sufficiency of the evidence after the verdict in
their motions to disregard the jury’s findings, for judgment notwithstanding the
verdict, and for a new trial. Accordingly, we hold that Russell and Mary properly
preserved their issues for our review.
Standard of Review
          When the party without the burden of proof challenges the legal sufficiency of
the evidence, we consider all of the evidence in the light most favorable to the
prevailing party, indulging every reasonable inference in that party’s favor.
Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 285-86 (Tex.
1998); Ned v. E.J. Turner & Co., Inc., 11 S.W.3d 407, 408 (Tex. App.—Houston [1st
Dist.] 2000, pet. denied). If there is more than a scintilla of evidence to support the
finding, we must uphold it. Formosa Plastics Corp. USA v. Presidio Eng’rs &
Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998). “When the evidence offered to
prove a vital fact is so weak as to do no more than create a mere surmise or suspicion
of its existence, the evidence is no more than a scintilla and, in legal effect, is no
evidence.” Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004) (quoting
Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)). However, if the
evidence supplies some reasonable basis for differing conclusions by reasonable
minds as to the existence of a vital fact, then there is some evidence. King Ranch,
Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003). 
The Agreement
          In their first three issues, Mary and Russell argue that there is “[n]o evidence
and legally insufficient evidence to support the jury answers” because (1) “the
contract covers only the placement of dentist assistants and hygienists and not
dentists”; (2) the May 1, 1998 fee schedule “sent seven months post-signing of
contract cannot be enforced since no new or additional consideration was given for
the modification and there existed no meeting of the minds concerning its terms”; and
(3) the “‘Placement Service Agreement’ is unenforceable since it fails to spell out
essential terms.”
Terms of Placement Agreement
          In their first issue, Mary and Russell argue that “[t]he jury finding of breach of
contract should be reversed and rendered in favor of Appellants” because “it is
undisputed that the underlying contract, sought to be enforced, applied only to the
placement of dental hygienists and/or assistants and not to dentists” and that “[t]he
plain language of the contract spells out only the amounts due for [Flanagan’s] work
as a dental hygienist.” 
          When a court concludes that contract language can be given a certain or
definite meaning, then the language is not ambiguous, and the court is obligated to
interpret the contract as a matter of law. DeWitt County Elec. Co-op., Inc. v. Parks,
1 S.W.3d 96, 100 (Tex. 1999); Markert v. Williams, 874 S.W.2d 353, 354 (Tex.
App.—Houston [1st Dist.] 1994, writ denied). The trial court must enforce an
unambiguous contract as written. Heritage Res., Inc. v. NationsBank, 939 S.W.2d
118, 121 (Tex. 1996). The rules of contract interpretation require us to give the
language in an agreement its plain grammatical meaning unless to do so would defeat
the intent of the parties. Parks, 1 S.W.3d at 101; Dorsett v. Cross, 106 S.W.3d 213,
219-20 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). 
         Here, Paragraph 9 of the Placement Agreement discusses TDS’s right to a
permanent placement fee upon a full-time arrangement between a TDS employee with
a TDS client. Paragraph 9 expressly provides that a TDS client agrees to pay to TDS
a permanent placement fee whenever a TDS client 
employs, joint ventures with, associates with or in any manner affiliates
with a service provider or enters into any contractual relationship with
a service provider referred to the client by TDS directly or indirectly
through any TDS placement, on a full time basis during the term of this
Agreement and for a period of one (1) year after the date of termination
of this Agreement . . . .
 
The introductory paragraph defines “service provider” as either a dental hygienist or
dental assistant and also provides that “TDS is in the business for referring for
temporary and permanent employment–dental hygienists, dental assistants or front
desks . . . .” The Agreement does not specifically include a “dentist” a “service
provider.” However, the two fee schedules, which provide that they are addenda to
any existing contract, do provide for the fees due to TDS for the placement of
dentists, as well as for the fees due for placement of dental hygienists and assistants. 
Additionally, both the Agreement and the fee schedules provide for a percentage of
a service provider’s gross compensation to be paid to TDS upon permanent placement
with a TDS client. Therefore, we conclude that the Placement Agreement with the
addenda provide for the placement of dentists. 
Modification of the Agreement
          In their second issue, Russell and Mary argue that the two fee schedules did not
modify the Agreement because “no new consideration was given for the fee
schedules.” Moreover, Russell argues that there was no “meeting of the minds”
between himself and TDS.
          Parties having the power to make a contract have the power to modify the
contract. Hathaway v. Gen. Mills, Inc., 711 S.W.2d 227, 228 (Tex. 1996). A
modification is a change or alteration that introduces new elements into details or
cancels some of them. Moser Co. v. Awalt Indus. Props., Inc., 584 S.W.2d 902, 906
(Tex. Civ. App.—Amarillo 1979, no writ). A modification requires that there exists
a meeting of the minds of the parties, and the terms of the original contract cannot be
unilaterally remade by one of the parties. Mandril v. Kasishke, 620 S.W.2d 238, 244
(Tex. Civ. App.—Amarillo 1981, writ ref’d n.r.e.). Furthermore, the modification
must be supported by new consideration. Walden v. Affiliated Computer Servs., Inc.,
97 S.W.3d 303, 315 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). A party
relying on a modification has the burden of affirmatively pleading and proving the
modification and its acceptance by the other party. Stowers v. Harper, 376 S.W.2d
34, 39 (Tex. Civ. App.—Tyler 1964, writ. ref’d n.r.e.). Whether a contract has been
modified is a question of fact. Hathaway, 711 S.W.2d at 228-29. 
          Lack of Consideration



          Consideration may consist of a benefit that accrues to one party or,
alternatively, a detriment incurred by the other party. Roark v. Stallworth Oil & Gas,
Inc., 813 S.W.2d 492, 496 (Tex. 1991); Iacono v. Lyons, 16 S.W.3d 92, 94 (Tex.
App.—Houston [1st Dist.] 2000, no pet.). Mary and Russell note that Lisa Carter
testified that she did not “pay either Mary Lyn Williams or Dr. Russell Williams” for
any change to the Agreement. On the other hand, TDS contends that “the
consideration occurred when neither Mary nor Russell terminated the placement
agreement within thirty (30) days of their receipt of either new fee schedule[s] as
required by Paragraph 16 of the placement agreement or by the mutual exchange of
performances under each fee schedule.” 
          Here, we hold that TDS gave additional consideration to support the changes
made to the Agreement. The consideration provided by TDS was the additional
service of the temporary and permanent placement of dentists with Mary and Russell. 
The Agreement itself expressly notes that TDS “is in the business of referring for
temporary and permanent employment” service providers for its clients. In exchange
for TDS’s additional service of placing dentists, the two addenda plainly provide for
the daily and half-day compensation rates to be paid to placed dentists, the daily fees
due to TDS for the daily placement of dentists, and, more importantly, the fee due to
TDS for all permanent placements of dentists. Furthermore, as noted above, Carter
explained that, because Russell and Mary hired Flanagan on a permanent basis, TDS
was no longer able to place Flanagan with others for her services. 
          
          Meeting of the Minds 
          Regarding meeting of the minds, Russell asserts that he “never even knew
about the proposed sweeping changes in the contract–much less consent[ed] to them.”
 However, he further asserts that “[w]hen he first learned about the changes, he made
clear that he did not agree to the terms.”
          The determination of whether there was a “meeting of the minds” is based upon
an objective standard of what the parties said and did, and not on their alleged
subjective states of mind. Addams v. Petrade Int’l, Inc., 754 S.W.2d 696, 717 (Tex.
App.—Houston [1st Dist.] 1988, writ denied). Here, the record shows that both Mary
and Russell were aware of the revised fee schedules and their terms. Both Carter and
Russell testified that, after TDS sent both revised fee schedules to Mary and Russell,
Russell paid the fees, pursuant to the new terms of the revised fee schedules, for the
temporary placement of dental assistants and dental hygienists, including for the
placement of Flanagan. See Joiner v. Elrod, 716 S.W.2d 606, 610 (Tex.
App.—Corpus Christi 1986, no writ) (actual notice and consent to modification may
be implied from behavior of parties when that behavior clearly establishes notice and
consent). Furthermore, Russell testified that, in order to pay TDS its fees, in addition
to the invoices sent by TDS, he (1) had used the revised fee schedules that were given
to Mary by TDS and (2) had used Mary’s explanation to him of what the fees were. 
This evidence contradicts Russell’s assertions that he “never even knew” of the
changes and “did not agree to the terms,” and supports a reasonable inference, and the
jury’s implied finding, that Russell assented to the addenda’s changes. Because there
is more than a scintilla of evidence to support the jury’s implied finding, we hold that
the evidence was legally sufficient to establish a meeting of the minds between
Russell and TDS in regard to the changes. 
Essential Terms 
          In their third issue, Mary and Russell argue that the “Agreement is
unenforceable since it fails to spell out essential terms.” Specifically, Mary and
Russell argue that the Agreement is unenforceable because (1) it “never contemplated
the referral by [TDS] of dentists”; (2) “the contract remained silent with respect to the
amount of the fee or how it would be calculated for a dentist placed in the office”;
(3) “[i]n the unanticipated scenario where the agency made a referral of a dentist, the
contract likewise failed to explain the minimum hourly compensation or the minimum
number of hours that the Appellants could offer the dentist for each day of practice”;
(4) “the contract failed to identify what the placement fee would be in the event that
the Appellants hired the dentist on a permanent basis”; and (5) “[e]ven by combining
the employment agreement with the unilaterally imposed fee schedule (which [TDS]
contend[s] modified the contract), no way exists to calculate the fee due the agency
given that Diana Flanagan, D.D.S. practiced dentistry independently under an office
sharing agreement.” 
          To be valid and binding, a contract must contain all essential terms and be
sufficiently certain so as to define the parties’ legal obligations. T.O. Stanley Boot
Co., Inc. v. Bank of El Paso, 847 S.W.2d 218, 221 (Tex. 1992); Nickerson v. E.I.L.
Instruments, Inc., 874 S.W.2d 936, 939 (Tex. App.—Houston [1st Dist.] 1994, writ
denied). An essential term is “one that the parties would have reasonably regarded,
at the time of contracting, as a vitally important ingredient in their bargain.” See
Nelly v. Bankers Trust Co. of Texas, 757 F.2d 621, 628 (5th Cir. 1985) (applying
Texas law).
          In this case, the Agreement and the two revised fee schedules included the
following terms: (1) a TDS client must pay the specified compensation to the dentists
and dental hygienists who are placed by TDS; (2) a TDS client must pay the specified
placement fees due to TDS for the placement of dentists, dental hygienists, dental
assistants, and administrative workers for an eight-hour and four-hour day; (3) a TDS
client must pay the temporary placement fees to TDS on a monthly basis; (4) TDS
will provide monthly invoices to a TDS client; (5) a TDS client owes permanent
placement fees to TDS when a TDS client provides full-time, permanent employment
to a service provider; and (6) the permanent placement fee is due in full before the
commencement of permanent employment. The terms noted above provide for the
amount and for the due dates for the fees owed to TDS for the temporary and
permanent placement of TDS employees with TDS clients. Thus, we hold that the
Placement Agreement, as modified by the two revised fee schedules, contained the
essential terms to constitute an enforceable contract.
          Accordingly, we hold that there was legally sufficient evidence to support the
existence of an agreement between TDS and Mary and Russell, which provided that
a permanent placement fee would be owed to TDS if a TDS client “employ[ed], joint
venture[d] with, associate[d] with or in any manner affiliated with . . . or enter[ed]
into any contractual relationship on a full-time basis” with a TDS service provider. 
Furthermore, however, the evidence was undisputed that neither Mary nor Russell
paid a permanent placement fee to TDS when Flanagan began to practice as a dentist
on a full-time, permanent basis after August 31, 1999, at the Wirt dental office. We
further hold that the evidence was legally sufficient to support the jury’s finding that
Mary and Russell breached their agreement with TDS.
          We overrule Mary’s and Russell’s first, second, and third issues. 
Attorney’s Fees and Prejudgment Interest 
          In their fourth issue, Mary and Russell contend that, “ [a]lternatively, the award
for attorney’s fees and prejudgment interest should be set aside given the ambiguity
in the contract and the fact that the contract fails to specify when the annual
placement fee (determined by the jury) was due.” Specifically, they argue that TDS
“has failed to establish the requisites for the recovery of attorney’s fees or pre-judgment interest spelled out in Tex. Civ. Prac. & Rem. Code § 38.002” because
(1) “the judgment, signed by the trial court, simply ran the ‘contractual’ interest
starting thirty (30) days from the one-year anniversary date of the start of Diana
Flanagan, D.D.S.’ first year of dental practice,” and (2) “the trial court’s mixing of the
initial contract with the supposed subsequent fee schedule and jury findings to arrive
at a start date for running the interest represents a one, two, three punch to [Mary and
Russell] who should not also now be required to pay for [TDS’s] atttorney’s fees and
interest.”
          First, section 38.001(3) provides that a party may recover reasonable attorney’s
fees if the claim is for an oral or written contract. Tex. Civ. Prac. & Rem. Code
Ann. § 38.001(8) (Vernon 1997). Here, because we have concluded that the evidence
was legally sufficient for the jury to determine that Mary and Russell breached their
written contract with TDS, we hold that TDS, as the prevailing party, was entitled to
an award of reasonable attorney’s fees.
          Second, a complaint regarding prejudgment interest must be preserved in the
trial court, usually by a motion to amend or correct the judgment or by a motion for
new trial. See Tex. R. App. P. 33.1(a); Allright, Inc. v. Pearson, 735 S.W.2d 240, 240
(Tex. 1987) (error regarding award of prejudgment interest must be preserved); Miller
v. Kendall, 804 S.W.2d 933, 945 (Tex. App.—Houston [1st Dist.] 1990, no writ)
(motion to amend or correct judgment or motion for new trial is proper vehicle for
preserving error in judgment). In their brief, Mary and Russell do not explain how
the trial court was made aware of their complaint regarding prejudgment interest. 
There is no evidence in the record that Mary and Russell filed a motion to amend or
correct the judgment. Mary and Russell, in their motion for new trial, did note that
TDS “merely plucked out of thin air” a date for prejudgment interest to begin to run. 
However, this comment, which does not comport with their argument on appeal, was
made in a footnote and did not adequately make the trial court aware of their specific
complaint regarding prejudgment interest. See Tex. R. App. P. 33.1(a). Thus, we
hold that Mary and Russell waived their complaint regarding the calculation of
prejudgment interest.
          We overrule Mary’s and Russell’s fourth issue.
Causation
          In their fifth issue, Mary and Russell argue that “[n]o evidence or insufficient
evidence exists that any breach of the contract by Mary Williams, D.D.S. was a
producing cause of damages given the uncontroverted testimony that she neither paid
or received any money/benefit from Diana Flanagan, D.D.S.’s first year of dental
practice.” 
          In an action for a breach of contract, actual damages may be recovered when
the loss is the natural, probable, and foreseeable consequence of the defendant’s
conduct. Mead v. Johnson Group, Inc., 615 S.W.2d 685, 687 (Tex. 1981); Winograd
v. Clear Lake City Water Auth., 811 S.W.2d 147, 156 (Tex. App.—Houston [1st
Dist.] 1991, writ denied). Here, the record shows that Mary signed the Placement
Agreement with TDS. Furthermore, it is undisputed that neither Mary nor Russell
paid TDS a permanent placement fee after Flanagan began practicing as a full-time
dentist at Mary’s and Russell’s office. Therefore, we hold that there was sufficient
evidence that Mary’s breach of the Agreement, as modified by the fee schedules, was
a cause of TDS’s injury.
          We overrule Mary’s and Russell’s fifth issue.
Quantum Meruit
          In their sixth issue, Mary and Russell argue that “[n]o evidence or insufficient
evidence exists that Russell Williams, D.D.S. or [Mary] Williams, D.D.S. was
unjustly enriched by Diana Flanagan, D.D.S.’ first year of dentistry.”
          Generally, when a valid, express contract covers the subject matter of the
parties’ dispute, there can be no recovery under a quasi-contract theory. Fortune
Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 684 (Tex. 2000); Atlantic Lloyds Ins. Co.
v. Butler, 137 S.W.3d 199, 227 (Tex. App.—Houston [1st Dist.] 2004, pet. denied)
(op. on reh’g). When a valid agreement already addresses the matter, recovery under
an equitable theory is generally inconsistent with the express agreement. Fortune
Prod. Co., 52 S.W.3d at 684; Atlantic Lloyds Ins. Co., 137 S.W.3d at 227. Here,
because we have concluded that a valid contract covers the subject matter of the
parties’ dispute, we need not address Mary’s and Russell’s issue regarding the legal
sufficiency of the evidence to support the jury’s findings concerning quantum meruit. 
Conclusion
          We affirm the judgment of the trial court.
 
 
 
                                                                        Terry Jennings
                                                                        Justice
 
Panel consists of Justices Nuchia, Jennings, and Alcala.
Justice Alcala, dissenting.