Reversed and Remanded and Majority Opinion and Concurring and Dissenting
Opinion filed March 6, 2008








Reversed
and Remanded and Majority Opinion and Concurring and Dissenting Opinion filed
March 6, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00714-CV

____________

 

GRAYBAR ELECTRIC CO., INC., Appellant

 

V.

 

LEM & ASSOCIATES, L.L.C., Appellee

 



 

On Appeal from the 165th
District Court

Harris County, Texas

Trial Court Cause No. 04-14628

 



 

M A J O R I T Y   O P I N I O N[1]








A company contracted to sell a power generation system,
including a manufacturer=s warranty, to a second company for sale
to a third company to be used in a United States Army project in the Iraqi
desert.  The seller sued the first buyer for amounts allegedly owed under the
sales contract, and the first buyer counterclaimed. The trial court rendered
judgment that (1) the seller recover $3.35 million plus prejudgment and
postjudgment interest and attorney=s fees, and (2)
the first buyer recover $100,000 plus prejudgment and postjudgment interest on
its counterclaim.  We conclude the trial evidence is legally and factually
sufficient to support the trial court=s denial of a
credit or affirmative award based on the seller=s failure to
provide the manufacturer=s warranty.  We conclude the trial
evidence is legally and factually insufficient to support the trial court=s conclusion that
a change order between the seller and the first buyer is void based on failure
of consideration, fraudulent inducement, or duress.  Based on the change order,
the evidence conclusively proves the first buyer is entitled to credits that
substantially reduce the judgment in favor of the seller.  Because the seller=s recovery is
being significantly reduced on appeal, we reverse the judgment in favor of the
seller and remand to the trial court with instructions to render judgment in
favor of the seller for the lower amount as well as the attorney=s fees and
interest hereafter found by the trial court following further proceedings. 
Because the trial court erroneously failed to award any attorney=s fees to the first
buyer based on its unchallenged recovery on its contract counterclaim, we
reverse and remand with instructions for the trial court to determine the
reasonable attorney=s fees for this counterclaim.

                        I.  Factual and Procedural Background

In 2003, as part of its work for the United States Army in
Iraq, Kellogg Brown & Root Services, Inc. (hereinafter AKellogg@) contracted with
appellant Graybar Electric Co., Inc. (AGraybar@) for the purchase
of a Pratt & Whitney FT8 Twin Pack System Turbine package (hereinafter ATwin Pack@), along with
related goods and services, to be deployed as a power generation system in the
Iraqi desert.  Graybar contracted with appellee LEM & Associates, L.L.C.
(hereinafter ALEM@) for the purchase of a Twin Pack.  LEM is
a supplier of electric-generating equipment, owned by Lee Mathieu.  LEM, in
turn, had a contract to purchase a Twin Pack from Ron Bigham d/b/a Green Power
Energy (hereinafter ABigham@).  Bigham had a
contract to buy a Twin Pack from Allegheny Energy for $8 million.  








Under its contract with Kellogg, Graybar was required to
arrange for Pratt & Whitney to provide a warranty covering the Twin Pack
and lasting until one year from the synchronization of the Twin Pack or 18
months from delivery, whichever came first (hereinafter AWarranty@).  Under its
contract with Graybar, LEM was required to provide such a warranty.  Under
hurried and somewhat chaotic circumstances, LEM sold the Twin Pack to Graybar
but did not provide the Warranty.  Graybar received the Twin Pack and started
loading and shipping it out of the country on August 7, 2003.  One week later,
Pratt & Whitney notified Graybar that, due to the drastically different
operating environment in the Iraqi desert, Pratt & Whitney was not willing
to simply consent to the assignment of the existing warranty from Allegheny. 
Within two weeks, Pratt & Whitney gave Graybar a proposal for a warranty
covering the Twin Pack, which would cost $703,000.  Despite the proposal, no
party ever purchased a warranty from Pratt & Whitney that would cover the
Twin Pack in Iraq.  Graybar, however, did contract with Pratt & Whitney to
provide various services, including technical services and oversight at a cost
of $998,100, that Graybar claims were required to make the Twin Pack
warrantable.  

While there had been disagreement between Graybar and LEM
as to what was being purchased under the contract and at what price, on or
about September 3, 2003, Graybar and LEM signed a letter agreement containing a
change order (hereinafter AChange Order@), which stated
that the original contract price was $12,102,000 and that deductions should be
made from this price for the following:

(1)     a $2 million payment that Graybar made
directly to Allegheny to obtain release of the Twin Pack, 

(2)     a black start generator, 

(3)     costs to convert the Twin Pack from 60 Hz to
50 Hz, and 

(4)     the cost
of gas compression skids. 

After
making these deductions from the contract price under the Change Order and
after subtracting the $6,150,000 that Graybar already has paid LEM, the amount
outstanding  would be $2,671,456.  

Before the Twin Pack was commissioned and started up, the
United States Army suspended the project.  








LEM filed this suit against Graybar.  Graybar
counterclaimed against LEM and filed third-party claims that are not relevant
to this appeal.  After a bench trial, the trial court rendered judgment in
favor of LEM and against Graybar in the amount of $3.35 million plus
prejudgment interest, postjudgment interest, attorney=s fees and costs. 
The trial court also rendered judgment in favor of Graybar in the amount of
$100,000 on its counterclaim for Acommission costs@ plus prejudgment
interest, postjudgment interest, and costs.[2] 


The trial court issued findings of fact and conclusions of
law, stating, among other things, the following:

!       On July 29, 2003, LEM sent Graybar a pro
forma invoice for a Twin Pack with an invoice price of $11.5 million. 

!       Subsequently, LEM represented that the Twin
Pack would have an extended Pratt & Whitney warranty against certain
defects for a period of 18 months from sale or one year from commissioning,
whichever occurred first.  

!       On or about August 7, 2003, Graybar accepted
LEM=s pro forma invoice dated July 30,
2003, requiring a 50% initial payment with Graybar=s purchase order, 40% before
shipment, and 10% at commissioning.[3] 
This invoice was amended by a pro forma invoice dated August 5, 2003.  

!       LEM agreed to convert the Twin Pack from 60
Hz to 50 Hz; however, LEM=s failure to make this conversion
was excused by Graybar=s act of moving the equipment out
of the country without giving LEM the required amount of time to accomplish the
conversion.[4]








!       LEM=s failure to provide the Pratt & Whitney warranty and
failure to accomplish the conversion are excused by Graybar=s obtaining the consent of LEM to
pay Allegheny directly, concealing the fact that Graybar would be obtaining a
bill of sale directly from Allegheny for the purpose of evading its payment
obligations to LEM.  Graybar did not pay LEM the amounts it owed to LEM. 
Though LEM offered to pay up to $1 million for a Pratt & Whitney warranty,
Graybar did not accept this offer.  

!       Even if LEM=s performance had not been excused, the court found
that Graybar only suffered a loss in the amount of $100,000, which the trial
court found was the commercially reasonable cost of performing the conversion
from 60 Hz to 50 Hz in the United States.  

!       The issue of the warranty is Amoot@ because Graybar never purchased a warranty for the
Twin Pack and because, even if LEM had provided a warranty at the time of sale,
the warranty would have expired by February 2005, and there is no evidence of
any defects that would have given rise to a warranty claim during the time
period in which the warranty would have been in effect.

!       The consideration for LEM to enter into the
Change Order was that LEM would be promptly paid the amount owed by Graybar to
LEM on the purchase order.  Because that did not occur, the consideration
failed.  In addition, the evidence shows that Graybar had no intention of
making such Aprompt@ payments at the time the Change
Order was executed and only made such a representation to secure LEM=s signature to the Change Order. 
LEM relied on this representation.

!       In this sale of goods between two merchants,
Graybar accepted LEM=s offer to sell the Twin Pack with
the Warranty, and the conversion services, all for a total of $11.5 million,
with 50% due on contracting, 40% due on shipping, and 10% upon commissioning.  

!       Although article 2 of the Uniform Commercial
Code governs the contract between Graybar and LEM, the common law governs the
Change Order.   Graybar obtained the execution of the Change Order  from LEM by
misrepresentations, upon which LEM relied to its detriment.  The Change Order
is void due to failure of consideration, fraudulent inducement, and/or duress
on the part of Graybar.  

!       Graybar is entitled to no damages or credits
other than a credit of $100,000, and after applying this credit, LEM is
entitled to judgment against Graybar for breach of contract in the amount of
$3.25 million.[5]








!       Graybar=s counterclaims
concerning warranty on the generator fail because the issue is moot; the
counterclaims also fail due to waiver and estoppel.  

Graybar has appealed, asserting fourteen issues.  LEM has
not appealed.

                              II.  Standards of Review

Because findings of fact in a bench trial
have the same force and dignity as a jury verdict, we review them for legal and
factual sufficiency of the evidence under the same standards we apply in
reviewing a jury=s findings. Catalina v. Blasdel,
881 S.W.2d 295, 297 (Tex. 1994).  

When reviewing the legal sufficiency of the evidence, we
consider the evidence in the light most favorable to the challenged finding and
indulge every reasonable inference that would support it.  City of Keller v.
Wilson, 168 S.W.3d 802, 823 (Tex. 2005).  We must credit favorable evidence
if a reasonable factfinder could and disregard contrary evidence unless a
reasonable factfinder could not.  See id. at 827.  We must determine
whether the evidence at trial would enable reasonable and fair-minded people to
find the facts at issue.  See id.  The factfinder is the only judge of
witness credibility and the weight to give to testimony.  See id. at
819.  








When reviewing a challenge to the factual sufficiency of
the evidence, we examine the entire record, considering both the evidence in
favor of, and contrary to, the challenged  finding.  Cain v. Bain, 709
S.W.2d 175, 176 (Tex. 1986).  After considering and weighing all the evidence,
we set aside the fact finding only if it is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust.  Pool v. Ford
Motor Co., 715 S.W.2d 629, 635 (Tex. 1986).  The trier of fact is the sole
judge of the credibility of the witnesses and the weight to be given to their
testimony. GTE Mobilnet of S. Tex. v. Pascouet, 61 S.W.3d 599, 615B16 (Tex. App.CHouston [14th
Dist.] 2001, pet. denied).  We may not substitute our own judgment for that of
the trier of fact, even if we would reach a different answer on the evidence.  Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998).  The amount of evidence
necessary to affirm a judgment is far less than that necessary to reverse a
judgment.  Pascouet, 61 S.W.3d at 616. 

                                         III.  Issues and Analysis

A.      Did the trial evidence conclusively
prove the seller=s failure to provide a manufacturer=s warranty resulted in $1,701,100
in damages to the buyer? 

First, we conclude that the sale of goods is the essence or
dominant factor of the contract between LEM and Graybar; therefore, article 2
of the Uniform Commercial Code  (AUCC@) applies to this
contract.[6] 
See Tex. Bus. & Com. Code Ann.
' 2.102 (Vernon
1994) (stating that article 2 of the UCC applies to transactions in goods); Continental
Casing Corp. v. Siderca Corp., 38 S.W.3d 782, 787 (Tex. App.CHouston [14th
Dist.] 2001, no pet.) (holding that, if a contract contains a mix of sales and
services, article 2 of the UCC applies if the sale of goods is the Adominant factor@ or Aessence@ of the
transaction).  Therefore, we are faced with a relatively unusual situation in
which the seller delivers the principal good that is the focus of the article 2
contract but does not deliver a required manufacturer=s warranty for
that good.  








Graybar seeks to recover an affirmative claim or a credit
of $1,701,100 based on LEM=s failure to provide the Warranty.  This
is not an instance of a breach of warranty; rather, it is a breach of a promise
to provide a warranty.  In such a circumstance, various measures of damages
might be appropriate.  In some cases, a benefit-of-the-bargain measure of
damages might be the best choice because it would give the buyer the difference
between the market value of the good with the warranty and the market value of
the good without the warranty.  See Allstate Ins. Co. v. Furr, 449
S.W.2d 295, 298 (Tex. App.CAmarillo 1970, writ ref=d n.r.e.).  In
this case, however, the contract does not allocate the purchase price so as to
provide a specific price for the warranty.  Furthermore, there is no evidence
as to the difference, if any, between the market value of the good with the
warranty and the market value of the good without the warranty, and Graybar did
not seek recovery based on this measure in the trial court.  

The Warranty would have expired by March 2005.  If a claim
had arisen during the period that would have been covered by the Warranty,
Kellogg might have sought to recover against Graybar the damage it incurred
because of the absence of the Warranty, and Graybar could have sought this same
claim against LEM.  See, e.g., Voisin v. O.D.E.C.O. Drilling Co.,
744 F.2d 1174, 1179 (5th Cir. 1984) (holding that party who breaches promise to
obtain insurance for other party is liable for breach-of-contract damages for
the amount that would have been covered by the insurer had the insurance been
obtained).  In this case, as noted by the trial court, there is no evidence
that anything occurred that would have triggered coverage under the Warranty.[7] 
Graybar sold the Twin Pack to Kellogg in August 2003, and there is no evidence
in the record that Kellogg has asserted a deduction, claim, or charge against
Graybar based Graybar=s failure to provide the Warranty.  








Under its third issue, Graybar argues that the trial court
erred in not awarding it a credit or affirmative award for $998,100.  Before
the United States Army suspended the project, Graybar contracted with Pratt
& Whitney for  technical services and oversight at this price.  Graybar
asserts that it was trying to remedy LEM=s failure to
provide the Warranty and that Pratt & Whitney required that it perform
these services before it would issue the Warranty.  The record contains copies
of emails sent by Pratt & Whitney before August 27, 2003, indicating that,
for Pratt & Whitney to provide a Warranty to the new owner of the Twin
Pack, Pratt & Whitney would need to (1) inspect the Twin Pack to determine
if it had been stored and shipped in accordance with Pratt & Whitney
procedures, (2) review the installation of the Twin Pack to confirm compliance
with Pratt & Whitney procedures, and (3) witness the start-up of the Twin
Pack.  These emails do not state how much Pratt & Whitney=s services in this
regard would cost.  In a letter dated August 27, 2003, Pratt & Whitney
submitted to Garybar a proposal for the following services:

Technical Services and Oversight on
a Consultant Basis to assist [Graybar=s] people in
installing the equipment in Iraq.  This price is for four people to support
construction and start up of our equipment.  The total days for this activity
is 210 man days. . . . This is for one site manager to be in Iraq for 70 days,
an electrical advisor to be in Iraq for 49 days, a mechanical advisor to be in
Iraq for 42 days[,] and a start-up engineer to be in Iraq for 49 days . . . . 

Pratt
& Whitney stated it would charge Graybar $998,100 for these services
(hereinafter ATechnical Services@).  In the August
27, 2003 letter, Pratt & Whitney did not state that performance of the
Technical Services was necessary for Pratt & Whitney to provide the
Warranty; however, Pratt & Whitney does state that a quote for the Warranty
has been provided under a separate proposal that Aaddresses all the
technical and commercial conditions.@  In this separate
proposal for the Warranty, Pratt & Whitney does not state that its proposal
to provide the Warranty for $703,000 is contingent on its provision of any
services or upon the items stated in the prior emails.  In its purchase order
accepting Pratt &Whitney=s proposal to provide the Technical
Services, Graybar describes the Technical Services as ACommissioning,
Start-up and Technical Support,@ and Graybar does not state that Pratt
& Whitney required Graybar to retain Pratt & Whitney to perform the
Technical Services before it would issue the Warranty.  Likewise, in the
invoices for the Technical Services, Pratt & Whitney does not state that
these services are related to the Warranty.  








During the time of the Twin Pack transaction, Morgan
McDaniel was a Graybar employee working on this transaction.  At trial,
McDaniel described the Technical Services as Aoversight on a
consultant basis to assist in installing of equipment in Iraq.@  The following
day, McDaniel testified that Bigham=s counsel was
mistaken when he understood McDaniel=s testimony the
day before to be talking about the Warranty issue with Pratt & Whitney. 
McDaniel testified that he did not testify the day before that Pratt &
Whitney was paid Aa whole bunch of money in connection with
this warranty issue.@

Graybar cites testimony from Phil Collins of ECP Tech
Services, a contractor hired by Graybar.  Collins testified that Graybar paid
$998,100 for Pratt & Whitney to provide technical supervision.  Collins
stated that Pratt & Whitney was providing a warranty and, with that, they
were going to have Aa certain number of spare parts to do,@ and they want to
make sure the installation would be done properly.  Collins testified that
Pratt & Whitney sent Aa guy over there to make sure that the
foundations are right, that the turbines are set right, that the alignment is
good.@  Collins stated
that Pratt & Whitney, as a matter of risk mitigation, would oversee
everything Ato make sure that when you turn [the Twin Pack] on[,]
it=s in good shape.@  Graybar also
cites testimony from its expert John Scott regarding the Pratt & Whitney
proposal to provide services for $998,100.  Scott testified that Pratt &
Whitney would want to do inspecting or supervision before it would issue a
warranty, as an assurance that the equipment had been installed, commissioned,
and started up properly.  Gregg Rogers of Graybar testified that Graybar paid
Pratt & Whitney $998,100 Ato get it warrantable.@  None of these
witnesses testified that Pratt & Whitney required that it be paid $998,100
for these services before it would issue the Warranty.  Even if they had so
testified, the trial court, as fact finder, was free to disbelieve this
testimony.[8] 
Pascouet, 61 S.W.3d at 615B16.  








Under the applicable standards of review, we conclude that
the evidence is legally and factually sufficient to support the trial court=s decision not to
award any damages based on the $998,100 that Graybar paid to Pratt &
Whitney.  Pascouet, 61 S.W.3d at 615B16 (concluding
evidence was legally and factually sufficient to support certain damage
findings).

As to Pratt & Whitney=s proposal to
provide a warranty covering the Twin Pack for $703,000, Graybar did not
purchase this warranty.  While Graybar was not required to cover in order to
recover damages, this proposal does not require the trial court to award
$703,000 as damages for LEM=s failure to provide the Warranty.  Unlike
the Twin Pack Warranty that Pratt & Whitney had given Allegheny, the
warranty proposed in the quote limited Pratt & Whitney=s aggregate
liability to $703,000.  As stated above, Graybar promptly sold the Twin Pack to
Kellogg and did not show that it incurred any liability to Kellogg based on the
failure to provide the Warranty.  Graybar did not prove up any
benefit-of-the-bargain damages.  Graybar elected not to purchase a warranty
from Pratt & Whitney. Under the applicable standards of review, presuming
without deciding that the evidence is legally insufficient to support the trial
court=s findings that
LEM is excused from providing the Warranty, we conclude that the evidence is
legally and factually sufficient to support the trial court=s decision not to
award Graybar any damages based on LEM=s failure to
provide the Warranty.[9] 
Pascouet, 61 S.W.3d at 615B16 (concluding
evidence was legally and factually sufficient to support certain damage
findings).  Accordingly, we overrule Graybar=s third issue.

B.      Are the trial court=s findings that
the Change Order is void due to failure of consideration, fraudulent
inducement, and duress supported by legally sufficient evidence? 








In its fifth, eighth, ninth, tenth, and eleventh issues,
Graybar challenges the trial court=s failure to give
Graybar credits under the Change Order.  The trial court noted that  the Change
Order, on its face, would lower the amount Graybar owes LEM; however, the trial
court found that the Change Order is void based on failure of consideration,
fraudulent inducement, and duress.[10] 
Graybar asserts that the trial evidence is legally insufficient to support the
trial court=s findings in this regard. 








Although the trial court correctly concluded that the sale
of the Twin Pack was a transaction governed by article 2 of the UCC, the trial
court erroneously concluded that common law governs Graybar=s purchase order
for the Twin Pack and the Change Order signed by the parties regarding this
transaction.[11] 
See Tex. Bus. & Com. Code Ann.
' 2.102; Continental
Casing Corp., 38 S.W.3d at 787.  The sale of goods is the essence or the
dominant factor of the Change Order; therefore, article 2 applies to the Change
Order.  See Tex. Bus. & Com.
Code Ann. ' 2.102; Continental Casing Corp.,
38 S.W.3d at 787.  Under article 2, no consideration is needed for an agreement
that modifies an article 2 contract.  See Tex. Bus. & Com. Code Ann. ' 2.209; El Paso
Natural Gas Co. v. Minco Oil & Gas, Inc., 8 S.W.3d 309, 314 (Tex.
1999).  LEM asserts that, even if the UCC governs the Change Order, it is still
a legal nullity because it purports to modify Graybar=s prior purchase
order; whereas the trial court found LEM=s July 30, 2003
and August 5, 2003 pro forma invoices represented the parties= contract.  The
Change Order refers to both Graybar=s purchase order
and to LEM=s July 30, 2003 pro forma invoice.  Under the
unambiguous language of the Change Order, LEM and Graybar agree that
adjustments should be made to the amount of Graybar=s obligation under
the sale-of-goods contract already existing between the parties.  Therefore, as
a matter of law, the Change Order falls under section 2.209, and no
consideration is needed for it.  See Tex.
Bus. & Com. Code Ann. ' 2.209; El Paso
Natural Gas Co., 8 S.W.3d at 314.  Under the applicable standard of review,
we conclude the trial evidence is legally insufficient to support the trial
court=s finding that the
Change Order is void because the consideration for the Change Order failed.

Regarding the trial court=s duress finding,
first, LEM did not plead duress.  See Tex.
R. Civ. P. 94 (stating that duress is an affirmative defense that must
be pleaded).  Second,  as a matter of law, there can be no claim of duress
unless the following elements are present:  (1) a threat or action was taken
without legal justification; (2) the threat or action was of such a character
as to destroy the other party=s free agency; (3) the threat or action
caused the opposing party=s free will to be overcome and caused the
other party to do that which it would not otherwise have done and was not
legally bound to do; (4) the restraint was imminent; and (5) the opposing party
had no present means of protection.  McMahan v. Greenwood, 108 S.W.3d
467, 482 (Tex. App.CHouston [14th Dist.] 2003, pet. denied). 
Under the applicable standard of review, the trial evidence is legally
insufficient to support the trial court=s implied finding
of these five elements as to the execution of the Change Order.








Regarding the trial court=s
fraudulent-inducement finding, the trial court necessarily found, among other
things, that (1) Graybar made a material representation that was false;  (2)
Graybar knew the representation was false or made it recklessly as a positive
assertion without any knowledge of its truth; (3) Graybar intended to induce
LEM to act upon the representation by signing the Change Order;  and (4) LEM
actually and justifiably relied upon the representation.  See Haase v.
Glazner, 62 S.W.3d 795, 798B99 (Tex. 2001); Coastal Bank SSB v.
Chase Bank of Texas, N.A., 135 S.W.3d 840, 843 (Tex. App.CHouston [1st
Dist.] 2004, pet. denied).   

In its appellate briefing, LEM asserts that a Graybar
representative unknown to Mathieu met Mathieu in Graybar=s Houston office
and falsely promised that Graybar would immediately pay LEM approximately $2.8
million if Mathieu signed the Change Order.  LEM argues that based on this
representation and in light of a recent conference call and Mathieu=s fear that
Graybar would never pay what it owed, Mathieu signed the Change Order because
he was willing to take on additional obligations in exchange for Graybar=s alleged promise
of immediate payment of $2.8 million.  However, the only evidence of this
alleged misrepresentation is Mathieu=s testimony that
while he was at Graybar=s Houston office in September 2003, a
woman, whom he thought was Silvia Gatrell,[12]
appeared and said, AI need you to come with me.  We have a
document that you need to sign.@  Mathieu testified that he went with her
to another office, and she presented him with the Change Order.  Mathieu then
testified as follows:

And she asked me to sign that.  I said, [A]Am I going to get paid,[@] >cause I thought she was Silvia Gatrell.  She had it
signed by Silvia Gatrell.  And she said yes.  I said, [A]We=ll get paid right off of this?[@] She said, [A]Yes.[@]  Well, I looked at this and I saw
what they had there and I saw, you know, 88.  [sic] We=re going to get 2.8 million dollars
on it right off, I=ll sign it.  No legal fees. 
Nothing. We=ll do it.  

Mathieu
testified that his state of mind concerning the signing of the document was
that he would get paid immediately.  In sum, the only possible evidence of
fraudulent inducement is that a woman whom Mathieu did not know but whom he
thought was Silvia Gatrell (1) asked him to sign the Change Order, (2) told he
him was going to get paid, and (3) told him he was going to Aget paid right off
of this.@  Based on these
three statements and after looking at the Change Order, Mathieu believed he
would be paid $2.8 million immediately, and so he decided to sign the Change
Order.  








LEM claims a reasonable factfinder could conclude that this
woman fraudulently induced Matthieu to sign the Change Order because Aright off@ is an adverb
meaning Aright away@ or Aimmediately.@  However, the
record evidence is that the unknown woman used Aright off@ in a
prepositional manner, indicating that Mathieu would be paid Aright off of [the
Change Order].@  Under the applicable legal standard, the trial
evidence is legally insufficient to support the trial court=s finding that
this woman made a material representation that she knew was false or made a
representation recklessly as a positive assertion without any knowledge of its
truth.  In any event, even if this woman had made a false representation with
scienter, under the applicable legal standard, the trial evidence is legally
insufficient to support the trial court=s finding that
Mathieu justifiably relied upon this representation.  Bennett v. Cochran, No. 14-00-01160-CV, 2004 WL 852298,
at *6 (Tex. App.CHouston [14th Dist.] Apr. 22, 2004, no pet.) (holding in
memorandum opinion that, as a matter of law, there was no evidence to support
the jury=s finding that plaintiff=s reliance was justifiable); Atlantic
Lloyds Ins. Co. v. Butler, 137 S.W.3d 199, 226B27 (Tex. App.CHouston [1st Dist.] 2004, pet.
denied) (affirming summary judgment as to fraud claim because there was no
genuine issue of material fact as to whether the plaintiff=s alleged reliance was justifiable); Beal Bank, S.S.B.
v. Schleider, 124 S.W.3d 640, 651B52 (Tex. App.CHouston [14th
Dist.] 2003, pet. denied) (holding that there was no evidence to support jury=s finding that
plaintiff=s alleged reliance on lender=s alleged
statements was justifiable); Bluebonnet Sav. Bank, F.S.B. v. Grayridge
Apartment Homes, Inc., 907 S.W.2d 904, 909 (Tex. App.CHouston [1st Dist.] 1995, writ
denied) (holding there was no evidence to support jury=s finding that alleged reliance by
borrower on alleged oral assurances by lender that loan restructuring proposal
would be accepted was justifiable). 








Because the evidence is legally insufficient to support the
three bases on which the trial court concluded that the Change Order is void,
the trial court should have calculated the amount outstanding based on the
Change Order, which would have resulted in an amount outstanding of $2,671,456.[13] 
Accordingly, we sustain Graybar=s fifth, eighth, ninth, tenth, and
eleventh issues.[14]

C.      Should the attorney=s fees award in favor of LEM be
remanded for further proceedings in light of the reduction in LEM=s recovery? 

Graybar argues that, if this court significantly reduces
LEM=s recovery, then
this court should reverse the award of attorney=s fees in favor of
LEM.  We agree.  Because this court is not reasonably certain that the trial
court=s attorney=s fees award was
not significantly affected by its error in awarding LEM $3.35 million, we
sustain Graybar=s twelfth issue, reverse the attorney=s fee award in
favor of LEM, and remand for a new trial as to the amount of attorney=s fees LEM should
be awarded.  See Young v. Qualls, 223 S.W.3d 312, 314B15 (Tex.  2007)
(per curiam). 

D.      Did the trial court err by not awarding Graybar
attorney=s fees based on the trial court=s award of
$100,000 to Graybar under Graybar=s counterclaim?








In its thirteenth issue, Graybar asserts the trial court
erred in not awarding Graybar Chapter 38 attorney=s fees based on
Graybar=s recovery of
$100,000 under its counterclaim.  After rendering judgment that Graybar recover
$100,000 on its counterclaim, the trial court issued findings of fact and
conclusions of law that indicate Graybar should take nothing on its
counterclaim, either because the trial court found that LEM=s obligation to
convert the Twin Pack from 60 Hz to 50 Hz was excused or because, even if LEM=s performance was
not excused, the $100,000 should be applied as a credit against LEM=s contract claim. 
The trial court did not change its judgment after it issued these findings and
conclusions.  In any event, in its judgment, the trial court awarded Graybar
$100,000.  On appeal, Graybar has not sought to change this $100,000 into a
credit against LEM=s contract claim.  See Tex. R. App. P. 38.1(e); Texas Nat=l Bank v. Karnes, 717 S.W.2d 901,
903 (Tex. 1986) (holding that Athe court of appeals may not reverse a
trial court=s judgment in the absence of properly assigned error@).  LEM has not sought this relief on
appeal either; indeed, it could not because it has not appealed the trial court=s judgment.  See Brooks v.
Northglen Ass=n, 141 S.W.3d 158, 171 (Tex. 2004).  Therefore, this court cannot disturb the
trial court=s judgment awarding Graybar $100,000 on its
counterclaim,[15]
and, based on this award, Graybar asserts the trial court was required to award
Graybar attorney=s fees. 








Under Texas law, the award of attorney=s fees to a
plaintiff recovering on a valid contract claim is mandatory under section
38.001 if there is proof of the reasonableness of attorney=s fees.  See
Tex. Civ. Prac. & Rem. Code Ann.
' 38.001 (Vernon
1995); Hassell Const. Co., Inc. v. Stature Commercial Co., 162 S.W.3d
664, 668 (Tex. App.CHouston [14th Dist.] 2005,  no pet.). 
While a trial court has the discretion to set the amount of  attorney=s fees, it does
not have the discretion to deny fees altogether if they are proper under
section 38.001.  See Tex. Civ.
Prac. & Rem. Code Ann. ' 38.001; Hassell
Const. Co., Inc., 162 S.W.3d at 668.  Because Graybar introduced evidence
regarding reasonable attorney=s fees and because Graybar recovered on
its contract counterclaim, the trial court erred by not awarding reasonable
attorney=s fees for this
claim.  Accordingly, we sustain Graybar=s thirteenth
issue, reverse the trial court=s judgment to the extent it failed to
award Graybar attorney=s fees, and remand to the trial court for
further proceedings to determine the amount of Graybar=s reasonable
attorney=s fees under
Chapter 38.

                                                IV.  Conclusion

Under the applicable standards of review, we conclude that
the evidence is legally and factually sufficient to support the trial court=s decision not to
award Graybar any damages based on LEM=s failure to
provide the Warranty.  However, the evidence is legally insufficient to support
the three bases on which the trial court concluded that the Change Order is
void.  The trial court should have calculated the amount outstanding based on
the Change Order, which would have resulted in an award of $2,671,456 in actual
damages  in favor of LEM.  Because no party has challenged the trial court=s judgment
awarding Graybar $100,000 on its counterclaim and because this award is based
on the conversion charges that are part of the credit from the Change Order, we
must deduct $100,000 from the credit against LEM=s contract claim
to avoid giving Graybar a windfall.  Therefore, we reverse the part of the
trial court=s judgment dealing with the LEM=s claims against
Graybar, and we remand the case to the trial court with instructions to render
judgment in favor of LEM and against Graybar awarding actual damages of
$2,771,456 plus court costs and the appropriate award of prejudgment interest, postjudgment
interest, and reasonable attorney=s fees to be
determined by the trial court in further proceedings on remand.  We reverse the
trial court=s judgment to the extent it failed to award Graybar
attorney=s fees based on
Graybar=s counterclaim,
and we remand to the trial court for further proceedings to determine the
amount of Graybar=s reasonable attorney=s fees under
Chapter 38 and for rendition of judgment based on this fee award. We need not
address the other issues Graybar asserts on appeal.[16] 









Based on our rulings, for good cause, and in the interest
of justice, we order Graybar and LEM to each pay one-half of the aggregate
appellate costs incurred in this case.

 

 

 

/s/      Kem Thompson Frost

Justice

 

 

Judgment rendered
and Majority Opinion and Concurring and Dissenting Opinion filed March 6, 2008.

 

Panel consists of
Justices Anderson, Frost, and Mirabal.*
(Anderson, J., concurring without opinion) (Mirabal, J., concurring and
dissenting).









[1]  This opinion is a majority opinion as to all issues
except appellant=s thirteenth issue; it is a  plurality opinion with
respect to appellant=s thirteenth issue.  





[2]  The trial court also awarded Bigham judgment against
LEM; however no party has appealed this part of the trial court=s judgment, and it is not relevant to this appeal.





[3]  This is the first and only time the trial court
mentioned this July 30, 2003, invoice in its findings of fact.





[4]  This finding appears to conflict with the trial
court=s judgment in favor of Graybar for $100,000 in Acommission costs,@ by
which the trial court appears to be referring to these Aconversion costs.@  





[5]  This finding is inconsistent with the trial court=s judgment awarding $3.35 million against Graybar and
then rendering judgment in favor of Graybar in the amount of  $100,000 on its
counterclaim rather than  crediting $100,000 against LEM=s claim.





[6]  The trial court also concluded that article 2 of the
UCC applies to LEM=s sale of the Twin Pack to Graybar.





[7]  Graybar seems to assert in places that this measure
of damages can never be used because the damages always must be measured at the
time of the breach.  Nonetheless, Graybar also cites section 2.714(a), which
does not contain this requirement, and Graybar seeks to recover damages based
on the value of services provided or quoted by Pratt & Whitney after the
time of breach.  See Tex. Bus.
& Com. Code Ann. ' 2.714(a)
(Vernon 1994) (allowing buyer under certain circumstances to recover as damages
for any non-conformity of tender the loss resulting in the ordinary course of
events from the seller=s breach as determined in any manner which is
reasonable).

 





[8]  On direct examination, Collins read from one of the
Pratt & Whitney emails described above, and he answered in the affirmative
when asked by Graybar=s counsel if the email describes Awhat has to be done in order to get the one-year
warranty quoted on and issued.@ Collins also
answered in the affirmative when asked if the Pratt & Whitney proposal
regarding the Technical Services was Ato
carry out . . . those negotiations [for the terms of the Warranty].@  This testimony is conclusory and, as noted above, it
is contradicted by subsequent documents regarding the Warranty and the
Technical Services as well as by part of McDaniel=s testimony.  In any event, the trial court was free to disbelieve
Collins=s testimony.





[9]  In finding of fact 11, the trial court found that,
even if LEM=s performance had not been excused, Graybar only suffered
a loss in the amount of $100,000, which the trial court found was the
commercially reasonable cost of performing the conversion from 60 Hz to 50 Hz
in the United States.  Therefore, the trial court found that Graybar did not
suffer a loss based on LEM=s failure to
provide the Warranty.  





[10]  On appeal, LEM asserts that Graybar=s request for credits against LEM=s recovery cannot succeed because Graybar=s breach of the contract by its alleged failure to
timely pay (and in other regards) discharged LEM from its obligations under the
contract.  This assertion is incorrect because, after these alleged acts, LEM
treated the contract as still in effect rather than rescinding the contract.  See
Hanks v. GAB Bus. Servs., Inc., 644 S.W.2d 707, 708 (Tex. 1982) (holding
that, despite election-of-remedies doctrine in Bocanegra v. Aetna Life Ins.
Co., 605 S.W.2d 848 (Tex. 1980), nonbreaching party had to decide whether
to rescind the contract or seek to enforce it when the material breach
occurred, rather than waiting until after trial and before judgment to decide,
and stating that nonbreaching party waived its right to rescind the contract
based on the other party=s material breach by (1) treating the contract as
still in effect following the material breach and (2) by filing suit to enforce
the contract); Gupta v. Eastern Idaho Tumor Inst., Inc., 140 S.W.3d 747,
757B58 (Tex. App.CHouston
[14th Dist.] 2004, pet. denied) (holding that, as a matter of law, nonbreaching
party was bound by the contract despite other party=s material breach because nonbreaching party continued
to demand performance under the contract following the material breach).





[11]  On appeal, LEM asserts that the trial court
necessarily found that Graybar violated the duty to act in good faith imposed
by section 1.203 of the UCC and that the trial court refused to enforce the
Change Order because of this finding.  The trial court made no such findings. 
Indeed, the trial court concluded that Texas common law rather than the UCC
governs the Change Order.  





[12]  Silvia Gatrell signed the Change Order on behalf of
Graybar.





[13]  The trial court found that LEM=s failure to perform the conversion was excused by
Graybar=s alleged actions in August 2003 in allegedly moving
the Twin Pack outside the United States without giving LEM enough time to
accomplish the conversion.  The trial court also found this failure was excused
by Graybar=s obtaining the consent of LEM to pay Allegheny
directly while allegedly concealing the fact that Graybar would be obtaining a
bill of sale directly from Allegheny, allegedly for the purpose of evading
Graybar=s payment obligations to LEM.  Even if these matters
would excuse LEM=s failure to perform the conversion, they would not
prevent LEM from later agreeing in the Change Order to a credit in favor of
Graybar based on LEM=s failure to make the conversion.  





[14]  LEM claims that Graybar cannot seek credits based on
the Change Order because it did not challenge the trial court=s thirteenth finding of fact.  We disagree.  In any
event, to the extent this finding conflicts with allowing credits to Graybar
based on the Change Order, we construe Graybar=s brief as having sufficiently challenged this finding.





[15]  Presuming without deciding that under the correct
analysis, Graybar should take nothing on its counterclaim, no party has
assigned error in this regard, and this court has no power to reverse the trial
court=s rendition of judgment on Graybar=s counterclaim.  See Karnes, 717 S.W.2d at
903.  Even if the trial court=s judgment is
erroneous, we must give effect to its unambiguous language, without considering
extrinsic matters.  See Reiss v. Reiss, 118 S.W.3d 439, 441B42 (Tex. 2003) (holding court must give effect to
unambiguous language of judgment even if such a judgment is wrong under the
law); State Farm Lloyds, Inc. v. Williams, 791 S.W.2d 542, 546 (Tex.
App.CDallas  1990, writ denied) (stating that, if judgment
is unambiguous, courts may not use extrinsic matters to give the judgment an
effect different from that expressed by the language of the judgment).  We
cannot use the trial court=s findings of
fact and conclusions of law to change the unambiguous language of the
judgment.  See Reiss, 118 S.W.3d at 441B42; Williams, 791 S.W.2d at 546.   





[16]  In its fourteenth issue, Graybar asserts the trial
court erred in holding that 50% of the contract price was due and owing and in
awarding prejudgment interest on those amounts because the contract the trial
court found as the basis for recovery recited that those amounts are not due
until certain events occur that have not been shown by LEM to have occurred. 
We need not reach this issue because we have concluded that the trial court
should have based its decision on the Change Order while this issue and the
argument under it presume for the sake of argument that the August 5th LEM
invoice is the operative document.  In one sentence in one footnote, Graybar
states that, Aif the Court were to uphold the Change Order, which
made the balance due upon issuance of the warranty and the commissioning of the
Twin Pack, the award of prejudgment interest would be erroneous, but the real
error would be in the award of damages to LEM.@  Graybar=s brief does not contain any argument, analysis,
citations to the record, or legal authorities regarding any assertion that
under the Change Order, Graybar has no liability to LEM at present.  See Tex. R. App. P. 38.1(h);  San Saba
Energy, L.P. v. Crawford, 171 S.W.3d 323, 337 (Tex. App.CHouston [14th Dist.] 2005, no pet.).





*  Senior Justice Margaret Garner Mirabal sitting by
assignment.